Marie Lucie JEAN, et al., Plaintiffs,

Lucien Louis, et al., Plaintiffs-Appellees, Cross-Appellants,

State of Florida, Intervenor-Appellant,

v.

Alan C. NELSON, et al., Defendants-Appellants, Cross-Appellees.

No. 82–5772.

United States Court of Appeals, Eleventh Circuit.

April 12, 1983.

1456

1458

Stanley Marcus, U.S. Atty., Miami, Fla., Leon B. Kellner, Asst. U.S. Atty., Robert L. Bombaugh, Atty. Gen., U.S. Dept. of Justice, Rudolph W. Giuliani, Associate Atty. Gen., Washington, D.C., for defendants-appellants, cross-appellees.

Kurzban & Kurzban, Ira J. Kurzban, Nat'l Emerg. Civ. Lib. Foundation and Haitian Refugee Center, Inc., Miami, Fla., Mary Gilmore and Terrence A. Corrigan, New York City, Michael J. Rosen, Miami, Fla., Christopher Keith Hall, New York City, for plaintiffs-appellees, cross-appellants.

Vera Weisz, Haitian Refugee Center, Inc., Miami, Fla., Bruce J. Winick, ACLU Foundation of Fla., Inc., Coral Gables, Fla., Irwin P. Stotzky, Univ. of Miami, School of Law, Coral Gables, Fla., for Haitian Refugee Center.

Kendrick Tucker, Deputy Atty. Gen., Tallahassee, Fla., for intervenor-appellant State of Fla.

Before KRAVITCH, HATCHETT and CLARK, Circuit Judges.

KRAVITCH, Circuit Judge:

This suit is before us on appeal from an order releasing over one thousand Haitian immigrants held in detention by the United States Government. The government detained the Haitians as part of a stringent immigration program that followed on the heels of the massive Cuban migration during the Mariel boatlift of 1980. Pursuant to the new policy Haitians were detained in camps or prisons pending a final determination of their right to remain in this country, a process that took months, or in some cases over a year.

This is a complicated case. The issues presented are complex. And, it is an involved case. The record on appeal is voluminous. It is a delicate matter as well: the court below noted the extensive publicity this case has received, and the strong feelings with which it is regarded by either side.

█ The judgment of the court below ordered the release of the detained Haitian immigrants. The district court's opinion stressed one basic principle: although the Executive, in concert with Congress, has wide authority to act to protect our borders, the governing branches must nonetheless act within the letter of the law. Despite our differences with the district court as to many of the individual bases for decision, as well as some particulars of the relief afforded, we concur in the judgment freeing the Haitians, and in that underlying rationale.

## I. The Predicate

### A. The Procedural Predicate

During the week of June 1–5, 1981 the Immigration and Naturalization Service ("INS") held mass "exclusion" hearings for Haitian immigrants to determine whether they were admissible to this country, or

should be deported. Many hearings were held behind locked doors in courtrooms from which counsel attempting to inform the Haitians of their rights were barred. Overwhelming evidence established that Creole translators were so inadequate that Haitians could not understand the proceedings nor be informed of their rights. Pursuant to these faulty hearings many Haitians were adjudged excludable from this country, and were subject to deportation.[1]

Although exclusion and the procedures by which exclusion occurred provided initial impetus for this action the issue of detention too was significant. Pursuant to Administration policy many Haitian immigrants were held in detention camps prior to a determination of excludability. Because of procedural difficulties, and the unwillingness of the government to parole those incarcerated, detention frequently continued for months; in some cases for over a year. In response to this situation the Haitian Refugee Center ("HRC") filed this cause in the United States District Court for the Southern District of Florida. Originally filed as a petition for habeas corpus on behalf of those unlawfully excluded from this country, the complaint was subsequently amended to request class certification allowing named plaintiffs to sue on behalf of themselves and a class of Haitian refugees similarly situated. Alleging seven grounds for relief, *inter alia* discrimination in enforcement of Administration policy and rulemaking in contravention of required administrative procedure, plaintiffs sought declaratory relief as to the validity of their claims as well as an injunction against enforcement of the Administration's policy mandating such proceedings and detention. Plaintiffs also sought a stay of deportation for any Haitian excluded pursuant to the challenged procedures and a stay of exclusion hearings for Haitians unrepresented by counsel. Hearings commenced shortly thereafter on preliminary injunctive relief.

On September 30, 1981, in a strongly worded opinion, the district court certified the class. The court found the INS was playing "a human shell game" with the Haitians, moving them around the country to desolate areas without available counsel or communication facilities. The court further found faulty the INS proceedings whereby eleven Haitians were deported; these proceedings included mass hearings, behind closed doors, without counsel or adequate translators. *Louis v. Meissner,* 530 F.Supp. 924, 926–28 (S.D.Fla.1981) [*"Louis I"*]. The court therefore enjoined deportation of, and further exclusion hearings for, class members unrepresented by counsel. The government chose not to appeal the preliminary injunction and requested an immediate trial.

On February 24, 1982, the district court dismissed four of the seven claims in the original complaint on jurisdictional grounds.[2] *Louis v. Meissner,* 532 F.Supp. 881 (S.D.Fla.1982) [*"Louis II"*]. That dismissal, which eliminated many procedural issues, brought to the fore the question of detention. On March 15, 1982, a six-week trial commenced. Three general issues were tried: a claim that the Administration implemented its new immigration policy in violation of the Administrative Procedure Act ["APA"] by failing to engage in notice and comment rulemaking; a claim that the immigration policy was enforced against the Haitians in a discriminatory manner, contravening their fifth amendment equal protection rights, and an issue of first amendment access rights among the Haitians, their attorneys, family and friends.

In a memorandum opinion dated June 18, 1982, *Louis v. Nelson,* 544 F.Supp. 973 (S.D. Fla.) [hereinafter *"Louis III"*], Judge Spellman determined that the government had violated the Administrative Procedure Act;

---

1. At some stage in the proceedings the government deported eleven Haitians pursuant to procedures they admitted were faulty and not in compliance with law. There is no appeal from an unlawful deportation. 8 U.S.C. § 1105a(c).

2. A number of judges heard different proceedings in this action. The district judge who entered the order enjoining exclusion hearings was not the same judge who eventually rendered judgment on the merits.

consequently he held the detention policy "null and void" and reinstated a prior policy of parole, one he determined "is in full force and effect." Pursuant to the prior policy the court ordered the release of all class members. It further held the plaintiffs had failed to prove their discrimination claim. Finally, the court declined to rule on the access claim, ostensibly because the issue was mooted by the release order.

Following the government's submission of a notice of intention to engage in rulemaking the district court granted a partial stay, the effect of which was to permit detention of aliens who arrived between the date the final judgment was entered and the date the new rules for detention were promulgated. The government appealed the judgment as to rulemaking; plaintiffs cross-appealed the discrimination and access issues, as well as the jurisdictional dismissal of the procedural claims. On July 13, 1982, this court denied the government's emergency motion for a stay pending appeal.

### B. The Factual Predicate

Haitians first began to appear on our shores in numbers in the early 1970's. Often travelling in small boats barely suited to ocean travel, the Haitians came to America seeking relief from economic oppression, as the government would have it, or to escape political oppression, as plaintiffs assert. By 1981, when the government action giving rise to this lawsuit began, the number of undocumented Haitians living in the south Florida area was estimated at thirty-five thousand.[3]

Although the decade-long influx of undocumented immigrants from the Caribbe-

an basin to south Florida presaged the end of the Administration's permissive attitude toward illegal immigration, an influx in which the Haitians participated, it was the arrival of Cuban immigrants that had the greatest impact. In the spring of 1980 the Mariel boatlift or "Freedom Flotilla" brought some 125,000 Cubans to our shores in a number of weeks. *Louis III,* 544 F.Supp. at 978. In response to this sudden, massive immigration, President Carter appointed a Select Committee on Immigration to examine the country's immigration woes. That committee issued a report in February, 1981 finding that an "immigration crisis" existed in this country. *Louis III* at 979. The "crisis" passed unresolved to the new Administration and in March 1981 President Reagan appointed a special task force to consider solutions. This body included the Secretaries of State, Defense, Transportation, Labor, Commerce, Health and Human Services, and the Director of the Office of Management and Budget. *Id.*

The task force examined several immigration problems, one of which was the number of undocumented aliens unlawfully in this country. Figures gathered by the task force indicated some three to six million aliens had settled here in violation of immigration laws. This massive body, living in constant fear of deportation, oftentimes was exploited by unscrupulous employers. Rather than attempt to apprehend these millions of immigrants, however, the Administration determined to offer a general amnesty to undocumented aliens in this country since 1978. Acting upon a task force recommendation the Administration proposed a special immigrant status to these illegal aliens. *See* 40 Cong. Q. Week-

---

**3.** In its statement of facts the government refers to the Haitian immigration as a "massive influx." Because this colors the issues somewhat, we note this characterization is not entirely correct. Over the last ten years some 35,000 to 40,000 Haitians have arrived at our shores. Brief of United States, Statement of Facts, p. 6 (35,000 in ten years); Testimony of Alan C. Nelson, 47 Tr. 1957–58 (45,000–50,000 in 15 years). The Commissioner of the INS testified that as compared to illegal immigrants of the last ten years the 40,000 Haitian figure "is not a very high percentage," especially

when compared with the influx of Mexicans, which constitutes the highest percentage. The district court's opinion noted a Task Force statement of "the mass influx of Cubans and Haitians . . . ," *Louis III* at 979, but that takes into account the arrival of 125,000 or more Cubans in several months, or three times the total number of Haitian immigrants in a fraction of the time. By almost all accounts it was mass immigration of Cubans that prompted tightening the net in which the Haitians were caught.

ly Report 3097–98 (1982) (S.2222 & H.R. 7357, neither of which has yet been enacted into law, contain "amnesty" provision).

The problem of the continuing influx into Florida remained. In fact, some task force members feared the amnesty program would trigger increased efforts by aliens to immigrate unlawfully, falsify their date of arrival, and claim entitlement to the amnesty status. The task force report proposed several solutions to the problems of unlawful immigration, therefore, including sanctions against those who employ illegal aliens, and amendment of the criminal laws regarding the rendering of assistance to aliens wishing to immigrate.

One particular recommendation adopted by the Administration as part of its new immigration policy gave rise to this suit. As part of the crackdown on unlawful immigration the task force recommended detaining aliens without parole pending a determination of their right to enter the country. The government had not resorted to widespread detention of undocumented aliens since 1954.

### C. The Legal Predicate

This section bridges the gap between a recommendation of detention and implementation of that policy. In the first part we discuss briefly the constitutional and statutory authority of the political branches over immigration matters, concluding that a policy of detention is within such authority and that Congress may delegate responsibility for detention decisions to the Executive branch. In the second part we review the rights of the Haitian immigrants as "excludable aliens" under the immigration laws, and conclude that although their rights are few, they are entitled to those rights explicitly granted by Congress. Finally, we review the statutory mechanism that grants the Attorney General authority to implement the recommendations of the task force.

### 1. Authority of the Governing Branches

We proceed to establish three essential points: (1) that the authority of the political branches over immigration matters and aliens is plenary and knows few bounds, (2) that Congress may, and has chosen to, delegate wide discretionary authority to the Executive to administer immigration matters, and (3) that the Executive's authority is limited by the statutory grant of Congress.

Although the Constitution fails to delegate specifically the power over immigration, the Supreme Court recognized almost a century ago that the political branches have plenary authority over immigration matters as an inherent concomitant of national sovereignty. *Mahler v. Eby,* 264 U.S. 32, 41, 44 S.Ct. 283, 287, 68 L.Ed. 549, 555 (1924); *Ekiu v. United States,* 142 U.S. 651, 659, 12 S.Ct. 336, 338, 35 L.Ed. 1146, 1149 (1892); *Chae Chan Ping v. United States,* 130 U.S. 581, 604, 9 S.Ct. 623, 629, 32 L.Ed. 1068, 1075 (1889) ["the Chinese Exclusion Case"]. Protection of the national borders is within the authority of the national government, inferred from the enumerated foreign commerce, treaty, war, and naturalization powers. *The Chinese Exclusion Case,* 130 U.S. at 604, 9 S.Ct. at 629, 32 L.Ed. at 1075. *See generally* Gordon & Rosenfeld, *Immigration Law and Procedure* § 1.5a (rev. 1982) [hereinafter *"Gordon"*]. Authority over the national borders encompasses all immigration matters, including exclusion of aliens. *Gordon* § 1.5a.

Congress and the Executive branch share the immigration power. *Ekiu,* 142 U.S. at 659, 12 S.Ct. at 338, 35 L.Ed. at 1149. It may be exercised by the Executive and the Senate through the execution of treaties, *id.,* through the legislative powers of Congress, *id.; United States ex rel. Knauff v. Shaughnessy,* 338 U.S. 537, 542, 70 S.Ct. 309, 312, 94 L.Ed. 317, 324 (1950), and in part by the Executive branch acting alone, as a function of its plenary authority over foreign relations. *Knauff v. Shaughnessy,* 338 U.S. at 542, 70 S.Ct. at 312, 94 L.Ed. at 324; *cf. United States v. Curtiss-Wright Export Corp.,* 299 U.S. 304, 57 S.Ct. 216, 81 L.Ed. 255 (1936). "Normally Congress supplies the conditions of the privilege

of entry into the United States. But because the power of exclusion of aliens is also inherent in the Executive department of the sovereign, Congress may in broad terms authorize the Executive to exercise the power, . . . ." *Knauff v. Shaughnessy,* 338 U.S. at 542, 70 S.Ct. at 312, 94 L.Ed. at 324.

Congress traditionally exercises authority over matters of immigration and exclusion through passage of immigration legislation. *See generally Gordon* § 1.2d–1.4g (detailing history of immigration laws). The most recent comprehensive piece of such legislation is the Immigration and Naturalization Act of 1952 as amended and codified at 8 U.S.C. [hereinafter "the 1952 Act"]. The 1952 Act is the primary focus of this suit; through this vehicle Congress transferred great authority over immigration to the Executive branch, the principal actor being the Attorney General. Section 1103(a) of the Act provides:

> The Attorney General shall be charged with the administration and enforcement of this chapter and all other laws relating to the immigration and naturalization of aliens, except insofar as [power is delegated to other actors] . . . .

The Act further provides: "[t]hat determination and ruling by the Attorney General with respect to all questions of law [under the Act] shall be controlling." *Id.* The Attorney General is given authority to delegate his powers under the Act to other employees of the Immigration and Naturalization Service or the Department of Justice. *Id.*

The Act vests in the Attorney General enormous statutory and discretionary authority over the procedures and policies of immigration. *See* 8 U.S.C. § 1103 (powers and duties of the Attorney General and Commissioner) (rulings of Attorney General controlling on questions of law; has control over employees of Service; may delegate any duties in his discretion; prescribes reg-

ulations, forms and bond; controls borders and appoints employees in his discretion for that purpose). This grant of discretionary authority ranks among the broadest of delegations by Congress to a government officer. *Cf.* K. Davis, Administrative Law Treatise § 8.10 (2d ed. 1979) [hereinafter "*Davis*"] (1952 Act replete with provisions allowing Attorney General to, in his discretion, take action concerning an alien). The authority further is delegated from the Attorney General to the Commissioner of the INS, as well as to regional and district directors. *Id. Gordon* § 1.7b. Even on the lowest rungs of the immigration service decisionmaking discretion is exercised in the name of the Attorney General.[4] *See Davis* § 8.10 (Attorney General's discretion exercised by the seven thousand employees of INS); *Gordon* § 1.7b (Attorney General may delegate any of his powers or duties to any officer or employee of INS).

Although the wide Congressional grants of discretionary authority embodied in the 1952 Act are permissible in the face of the inherent Executive function to manage foreign affairs, *see supra,* the Executive's ability to act in the absence of a Congressional grant of authority is limited. *Mahler v. Eby,* 264 U.S. 32, 45, 44 S.Ct. 283, 288, 68 L.Ed. 549, 557 (1924); *cf. Knauff v. Shaughnessy,* 338 U.S. at 542, 70 S.Ct. at 312, 94 L.Ed. at 324 (executive officers may be entrusted in broad terms to carry out Congressional intent). However, the joint authority of Congress and the Executive over immigration, and particularly over aliens seeking admission to this country, is extremely broad. *Gordon* § 1.5a; *Knauff v. Shaughnessy,* 338 U.S. at 542–44, 70 S.Ct. at 312–13, 94 L.Ed. at 324–35.

### 2. Rights of the Alien

▆▆▆ Legal "rights" of an alien vary with his "status" under the 1952 Act. The determinative factor is whether the alien

---

**4.** The Attorney General is statutorily authorized to confer on *any* employee of the United States the authority and duties of an INS employee. 8 U.S.C. § 1103(a); *Gordon* § 1.7b. While this far-reaching a delegation did not

arise in this suit, attenuated delegation of unguided discretionary authority certainly contributed to the misadministration of government policy. *See infra* at 1473–1474 (detailing lack of guidance of parole decisions).

has effected an "entry" into this country. *Leng May Ma v. Barber,* 357 U.S. 185, 188, 78 S.Ct. 1072, 1074, 2 L.Ed.2d 1246, 1248–49 (1958) (law distinguishes between aliens on border seeking to enter and aliens in country, whether legally or not); *Barber v. Gonzales,* 347 U.S. 637, 640, 74 S.Ct. 822, 824, 98 L.Ed. 1009, 1012–13 (1954) (whether individual is deportable depends on "entry" status under Act). *Compare* 8 U.S.C. §§ 1221–1230 (rights of aliens seeking to enter) *with* 8 U.S.C. §§ 1251–54 (rights of aliens in deportation). As a general rule aliens who have effected an entry, whether lawfully or not, are accorded the full panoply of traditional due process rights. *See Shaughnessy v. United States ex rel Mezei,* 345 U.S. 206, 212, 73 S.Ct. 625, 629, 97 L.Ed. 956, 963 (1953) [hereinafter "*Mezei*"]. As a function of plenary Congressional authority, however, aliens seeking to enter this country, as opposed to those who have entered, find much less process due an adjudication of their right of entry.[5]

In several cases decided in the early 1950's the Supreme Court emphasized the limited rights of an alien seeking entry. *See Mezei, supra,* 345 U.S. at 212, 73 S.Ct. at 629, 97 L.Ed. at 963; *Knauff v. Shaughnessy, supra,* 338 U.S. 537, 70 S.Ct. 309, 94 L.Ed. 317 (1950). In *Mezei* the Court held that an alien's constitutional and statutory rights were not violated when he was excluded from the United States upon order of the Attorney General for security reasons without a hearing or disclosure of evidence, even when that exclusion resulted in indefinite detention on Ellis Island because all efforts to deport him had failed. The Court noted that an alien who has effected entry is entitled to proceedings conforming to traditional due process. "But an alien on the threshold of initial entry stands on a different footing: 'Whatever the procedure authorized by Congress is, it is due process

as far as an alien denied entry is concerned.'" (citation omitted).

Congress has not left the excludable alien without rights, however. In the 1952 Act Congress provides a process for determination of an alien's claim of admission; although limited that process affords the alien certain traditional due process protections. An alien seeking entry is entitled to a determination of the validity of his claim in an exclusion hearing before an immigration judge (equivalent to an administrative law judge). At the hearing an alien has the right to be confronted with, and combat, the evidence against him, to examine and cross-examine witnesses, and to present evidence. *See generally* 8 C.F.R. § 236.2 (hearing procedures); *Gordon* § 3.19a & b (same). Further, should the immigration judge decide the alien is not entitled to entry, that decision may be appealed to the Board of Immigration Appeals acting as surrogate for the Attorney General, 8 U.S.C. § 1226(b); 8 C.F.R. § 236.7, and finally the alien may challenge the order of deportation in the appropriate United States District Court by way of a writ of habeas corpus, 8 U.S.C. § 1105a(b).

Accompanying the statutory right to an exclusion proceeding are several incidental statutory entitlements. For example, any alien arriving at our shores may file an application for asylum with the district director or the immigration judge. 8 C.F.R. § 208.3. Although a number of practices incidental to the exclusion hearing are here challenged, one particular concomitant power—the parole power of the Attorney General—provides the primary basis for this litigation.

### 3. *The Attorney General's Parole Authority*

Because entry status is determinative of the procedure afforded an alien, aliens not clearly admissible are detained "at the bor-

---

**5.** "The irony of this distinction is that deportable aliens, many of whom entered this country surreptitiously, are given more rights under the law than excludable aliens who present themselves to immigration. The practical effect of this is to encourage those who attempt to sneak across the border because they are rewarded with greater rights than those aliens who attempt to comply with our laws." *Louis III* at 977 (footnote omitted).

der" by INS pending an exclusion hearing. 8 U.S.C. § 1225(b). This detention permits maintenance of the "no entry" status. Section 1225(b) provides in pertinent part:

Every alien ..., who may not appear to the examining immigration officer at the port of arrival to be clearly and beyond a doubt entitled to land *shall be detained for further inquiry.*

(emphasis supplied). Parole is a means, however, of allowing an alien into the country temporarily pending determination of admissibility in an exclusion hearing, without destroying the fiction of "no entry" status. To this effect 8 U.S.C. § 1182(d)(5)(A) provides in pertinent part:

The Attorney General *may ... in his discretion parole* into the United States temporarily *under such conditions as he may prescribe for emergent reasons or for reasons deemed strictly in the public interest* any alien applying for admission to the United States, but such parole of such alien shall not be regarded as an admission of the alien ....

(emphasis supplied).

Exercise of the parole authority has varied. Prior to 1954 parole was rarely granted. After 1954, until the present time, however, this country maintained a policy of ready parole of aliens seeking entry into the country. As a result of the new policy announced by the Administration in 1981 the exercise of parole power has tightened again. *See infra* at 1468–1469 (discussion of old policy).

### D. *The Policy Predicate*

Although the statutory scheme provides for detention and parole, enforcement of the statute has varied widely since its enactment, depending upon the "policy" of the current Administration. The policy here at issue, adopted as a result of the recommendations of the Task Force on Immigration, was announced in July of 1981 and inaugurated the Reagan Administration's program to "enforce" the immigration laws in order to gain control over the influx of undocumented immigrants. Count II of plaintiffs' complaint alleged the

Administration initiated its policy without following procedures mandated by the Administrative Procedure Act. Count VII alleged discriminatory application of the policy.

Yet, after weeks of trial and pages of exhibits and testimony, no clear picture of the entire policy emerged. It is apparent the policy requires strict adherence to the "detention" language of § 235 of the 1952 Act, 8 U.S.C. § 1225(b), and a concomitant tightening of the discretionary parole authority in § 212 of the 1952 Act, 8 U.S.C. § 1182(d)(5)(A). Any further effort to define the policy, however, is futile on the basis of the record before us. Whenever plaintiffs offered a document purporting to establish the policy the government denied its relevance, no doubt because the document inevitably was captioned "Haitian Program," which would constitute irresistible proof of discriminatory motive. Whenever the government witnesses sought to explain the policy the plaintiffs demurred on the ground it was nowhere in writing. No witnesses described the "policy" similarly. *See Louis III* at 981, n. 22.

The resolution of this action requires an understanding of what the evidence at trial showed, or failed to show, about the policy. The district court made extensive findings, no simple task given the state of the evidence. We have reviewed those findings and carefully examined the evidence in order to determine whether that evidence supports the conclusions of the court below. Although we are in substantial agreement with the district court, which noted the failings of the evidence, we believe the court did not always apply its factual determinations in a consistent manner. In order to explain cogently where we agree and differ with the court below, we set out in full our understanding of what the evidence did, and did not, support in regard to the government's policy.

### 1. *The Old Policy*

Parole of aliens pending an exclusion hearing is a relatively recent phenomenon. Prior to 1954 it was INS policy to detain

almost all aliens at the port of entry pending a determination of their admissibility. Gordon testimony, 38 Tr. 115, 123 *et seq;* 32 Int.Rel. No. 12 (March 27, 1955).[6] Large detention centers existed for this purpose at San Francisco, California and Ellis Island, New York. In 1954, however, the new Commissioner of the INS, General Swing, decided that this policy of mass detention was inhumane and unnecessary. General Swing consulted with the Attorney General, and they determined to close Ellis Island. At that time the policy changed, and aliens were paroled freely into the United States pending a determination of admissibility. There were two exceptions to the rule of general parole: when there was a likelihood of the alien absconding, and when the alien's "freedom of movement could be adverse to the national security or the public safety." 32 Int.Rel. No. 12 (March 22, 1954). The parole policy was flexible in that reasonable restrictions could be imposed by INS to insure availability of the alien. *Id.; see also Leng May Ma v. Barber,* 357 U.S. at 190, 78 S.Ct. at 1075, 2 L.Ed.2d at 1250 (physical detention now exception not rule).

The 1954 closure of the Ellis Island immigration center was accompanied by announcements that detention of undocumented aliens in exclusion was to cease, except in "but a few cases" where the alien was deemed "likely to abscond or those whose freedom of movement could be adverse to the national security or the public safety." *See* Address of the Attorney General, Nov. 11, 1954, reported in 32 Int.Rel. No. 12, "New Detention Policy of the Immigration and Naturalization Service." The Attorney General acknowledged the general parole program as a change of policy. The Supreme Court haled the parole policy as one that exhibited the "humane qualities of an enlightened civilization," *Leng May Ma v. Barber,* 357 U.S. at 190, 78 S.Ct. at 1075, 2 L.Ed.2d at 1250.

The court below acknowledged the post-1954 general parole policy. *See Louis III* p.

980 n. 18. We concur in its findings in this regard. This policy (prior to the recent change established at trial), [hereinafter "old policy"], was one of general parole. Detention was rare, and limited to those aliens who were likely to abscond, or who posed a threat to the national security.

2. *The Policy Change*

On July 30, 1981 the President of the United States issued a statement emphasizing the need to "establish control over immigration" to guarantee that foreigners are admitted to this country "in a controlled and orderly fashion." That same morning the Attorney General of the United States addressed a joint subcommittee of Congress testifying that "[w]e have lost control of our borders. We have pursued unrealistic policies. We have failed to enforce our laws effectively." Testimony of William French Smith, Attorney General, before the Senate Subcommittee on Immigration and Refugee Policy and the House Subcommittee on Immigration, Refugees, and International Law, July 31, 1981, at 1 [hereinafter *"French Testimony"*]. Accordingly, the Attorney General announced the Administration's comprehensive plan to combat the country's immigration problems. Part of this program was a return to a policy of detention of undocumented aliens.

At trial, Administration officials could not agree on whether the policy actually changed following the President's pronouncement. Alan C. Nelson, former Deputy Commissioner, INS, who became Commissioner in January of 1982, maintained that no change in policy had occurred. Rather, increased "enforcement" of the detention statute resulted from the acquisition of detention space. Nelson stated: "plaintiffs' claim that INS has recently changed its detention policy by restricting the use of parole is not founded upon or supported by any change in the applicable statute or regulations." Plaintiff's exhibit ["Px"] 71C (Declaration of Alan C. Nelson, and accompanying affidavit). Joe Hower-

---

**6.** Interpreter Releases, published by the Common Council for American Unity, provides information on "Immigration, Naturalization and Related Problems."

ton, the District Director of INS District VI in Miami also claimed the shift to detention was based only on the increased availability of detention space. 48 Tr. 2186. He disclaimed knowledge of, and testified he never received notice of, a change in policy following the President's announcement on July 30, 1981. *Id.* at 2211.[7]

Despite the above testimony to the contrary, the evidence clearly indicates that the Administration viewed its announcement on July 31, 1981 as a change in direction of immigration policy. On the same day the President issued his statement both the Attorney General of the United States, William French Smith, and the then Commissioner of the INS, Doris Meissner, testified before Congressional committees. Smith, on behalf of the Administration, proposed a legislative package to reform many immigration laws. One specific request was for $35 million for increased detention space "to detain temporarily illegal aliens upon arrival pending exclusion or granting of asylum." *French Testimony* at 12. Detention was necessary as part of a program to "deter the continuing arrival of illegal undocumented aliens to our shores." Meissner described the litany of evils that led to the current immigration problem, then explained the new policy: "[t]herefore, in the future, undocumented aliens ... will be placed in administrative detention pending the determination of their admissibility." Testimony of Doris M. Meissner, Commissioner, INS, before the Senate Committee on the Judiciary, Subcommittee on Immigration & Refugee Policy, July 31, 1981, at 2, 9 [hereinafter *"Meissner Testimony"*]. When deposed for this action Ms. Meissner was asked "[b]ut, it is your testimony if I understand it, that there was a change in policy and practice as of July 31, 1981," to which she replied, "[t]hat is right." Deposition of Doris Meissner, September 1, 1981 [hereinafter Meissner Dep.] at 7.

The district court reviewed this evidence and determined there had been a change in policy. It stated that "on July 31, 1981, the President issued a statement on the immigration policy of this nation." *Louis III* at 980. The district court repeatedly referred to the policy as the "new policy," and based its Administrative Procedure Act ruling on a change in policy [hereinafter "policy change"]. This finding, that there was a change in policy, is amply supported by the evidence; on July 31, 1981 the immigration policy changed from what was instituted in 1954 when Ellis Island was closed, (the "old policy") to a new program, described *infra* (the "new policy").

### 3. The New Policy

Evidence concerning the substance of the Administration's "new policy" reveals the particulars of the new policy never were developed fully. Immigration inspectors were left to exercise discretion in an unguided fashion with the result that many individuals were deprived of their liberty in an arbitrary manner.

The Administration's announcement of its new policy on July 30, 1982, was accompanied by much heraldry, but little substance. Although, the government was going to curb the waves of refugees arriving upon the shores of south Florida, it was not at all clear how this was to be accomplished within the framework of the immigration laws. The President's initial policy statement did not mention detention. He spoke of "sudden influxes of foreigners," and the need to "establish control over immigration" to ensure aliens are admitted, or not admitted, in a "controlled and orderly fashion." In this regard the President enumerated a number of "steps," none of which was detention. The statement concluded, "[t]he steps we take to further these objectives, however, must also be consistent with

---

**7.** Were it not for clear evidence of the "old policy" a plausible explanation for Nelson's and Howerton's disagreement with the rest of the Administration might be that the new policy involved nothing more than increasing detention space. This explanation fails however in the face of overwhelming evidence that detention after 1954 was to be "the exception, not the rule." *Leng May Ma v. Barber,* 357 U.S. at 190, 78 S.Ct. at 1075, 2 L.Ed.2d at 1250.

our values of individual privacy and freedom."

The Attorney General of the United States, charged by statute with regulation of immigration, testified before Congress on the day the President announced the new policy. Although he did mention detention, ". . . [t]he Administration will seek additional resources for the construction of permanent facilities in which to house undocumented aliens temporarily until their eligibility for admission can be determined," he offered no specifics as to parole. His only guideline was evenhanded treatment. "By treating those who arrive by sea in the same way we have long treated those who arrive over our land borders, our policy will be evenhanded, and we can avoid the severe community disruptions that result from large-scale migrations." *French Testimony* at 15.[8]

Three highly placed Administration officials gave insight into the specifics of the new policy. Doris Meissner, the former Commissioner of the INS testified before Congress, and was deposed for this action. Rudolph W. Guiliani, Associate Attorney General, the third ranking official at the Department of Justice, bearing primary responsibility for immigration, testified at trial. Commissioner Nelson also discussed the specifics in his trial testimony. The officials contradicted one another several times, and did not agree on the substance of the policy.[9]

This evidence, and lack thereof, indicates the disarray with which the Administration

---

8. What the Attorney General could have meant by this remark is unclear. Evidence at trial showed that over 200,000 Mexicans arrive here every year, undetected, and remain in the country. See Px71a (memorandum to President's Task Force from Hiller) (19 May 1981). Additionally, the new policy as to Mexicans was to have a temporary worker permit for some of them, an advantage not at all available to Haitians. See *French testimony* at 8 (proposed temporary worker program for Mexican nationals). Further, government witnesses stated Mexicans apprehended at the border choose to voluntarily return to Mexico (perhaps to try again), which is not universally the case with the Haitians, so they hardly can be equated. See *Louis III* at 1001 (voluntary withdrawal of Mexicans).

9. For example, Guiliani testified that parole was appropriate for "exigent circumstances, humanitarian reasons," 49 Tr. 2270 but admitted "I'm not sure I know all the categories of parole." *Id.* at 2322. (Guiliani in fact failed initially to distinguish detention from parole, claiming § 235 of the 1952 Act required detention unless there was a colorable right to enter, or unless one of the exceptions for "exigent circumstances, humanitarian reasons" was met. 49 Tr. 2269–70. Section 235, of course, contains no exceptions). Nelson's testimony did not differ significantly from Guiliani's. He stated parole was available for "emergency reasons or public policy reasons and this situation where there might be medical or family reunification considerations—." 47 Tr. 1887. (Nelson may have meant "emergent reasons." 8 U.S.C. § 1182 specifically provides for discretionary parole for "emergent reasons or for reasons deemed strictly in the public interest"). Neither the testimony of Nelson, nor that of Guiliani, explained the policy in any depth, however.

Commissioner Nelson's testimony conflicted directly with that of his predecessor, Commissioner Meissner. Meissner testified that although not the sole factor, an alien would be subject to release if he established a prima facie case for asylum, regardless of document status. Meissner Dep. at 5, 9; *Meissner testimony* at 9. Nelson disagreed. At trial he stated a valid claim for asylum would not justify avoiding detention if documents were fraudulent. 47 Tr. 1999.

Fortunately, Meissner's testimony, both before Congress and in her deposition, was forthright enough to allow us to understand the basic policy. Before Congress she stated:

Therefore, in the future, undocumented aliens arriving in the United States who do not choose to depart voluntarily will be placed in administrative detention pending the determination of their admissibility. The only exceptions will be those who have prima facie claims for asylum or legal immigration status, or who have close relatives residing legally in the United States.

*Meissner testimony* at 9. On another date she made clear the new policy was "really quite the opposite" of the old. Meissner Dep. at 5.

Of greatest import, however, was Meissner's candor. On September 1, 1981, six weeks after the Administration announced its new policy, she admitted the policy was not being applied uniformly, time and time again admitted these were new procedures not fully developed, and stated: "we are just pulling this all together now to be certain that it is uniform *because some of these things, as you know, have developed along different streams.*" Meissner Dep. at 8 (emphasis supplied).

pursued its new policy.[10] The district court generally took a similar view of the facts. It stated, in a section entitled "policy change,"

> Part of the new immigration program approved by the President called for more restrictive use of parole and increased use of detention. However, the Task Force's proposal in this area, and the statute on which they relied, did not indicate to those who had to administer the new policy which excludable aliens were to be detained. Justice Department and INS personnel were given the responsibility to develop the specific aspects of this plan.

> The people in charge of drafting the detention guidelines were cognizant of the fact that the new policy was not applicable to all excludable aliens. INS never intended to physically incarcerate persons who complied with the prescribed procedures for admission but were excludable on minor, technical grounds such as a clerical error on their visa. The policy was designed to deal with another Mariel type situation, regardless of the nationality or number of the arriving aliens. Therefore, the guidelines for detention had to reflect the perceived characteristics such a group of aliens would have. The problem was isolating these characteristics and incorporating them into guidelines that were capable of being objectively applied in individual cases.

> The President did not specify whether the development of specific detention and parole criteria was to be accomplished internally by INS or through a rulemaking procedure in which the public could participate. *INS elected to do neither.* They admitted to the Court that they made a conscious decision not to promulgate a rule pursuant to the Administrative Procedure Act. The evidence shows that they never seriously undertook the difficult task of drafting a set of guidelines concerning which aliens would be placed in detention. Instead, INS issued general instructions to its field officers to start detaining excludable aliens who do not establish a prima facie claim for admission.

(emphasis in original).

> *Defendants can point to no operating instruction, internal memorandum or other document that completely reflects the official detention policy. Consequently, the Court cannot precisely define the criteria for detention any better than the Government's witnesses articulated them.* However, the general theme that emerges from the evidence is that aliens are to be detained unless and until they establish to INS' satisfaction a prima facie claim for admission. Within this framework, the District Director had no discretion to grant deferred inspection to Haitians arriving aboard non-signatory carriers without first placing them in detention.

*Louis III* at 980–81 (emphasis supplied).[11]

In its determination that the new policy never was promulgated or set out in guide-

---

**10.** A sample of the conflicting testimony appears, *supra* n. 9.

**11.** The distinction between criteria for detention and criteria for parole is blurred throughout the trial. The district court attempted to eliminate the confusion, noting:

> In referring to 'criteria for detention' the Court means those factors that would be considered by the immigration inspector in determining whether an excludable alien should be given a deferred inspection or placed in detention. Parole criteria are factors to be considered in determining whether an alien in detention should be released.

*Louis III* at 981 n. 23. The district court's opinion indicates, however, that the Administration failed to develop criteria for either pa-

role or detention. *Id.* at 981 (President failed to specify whether detention and parole criteria were to be developed internally or through rulemaking; "INS elected to do neither"). That is why we cite as error the requirement of the court below that plaintiffs bear the burden of including in their statistics certain parole criteria. There is no basis in the record for identifying any specific parole criteria. The testimony is contradictory as to what the criteria were, and fails to show that *any* criteria were provided to those enforcing the policy.

One further point bears notice. The district court stated in the textual quote "the District Director had no discretion to grant deferred inspection to Haitians arriving aboard non-signatory carriers without placing them in detention." Though not at issue on appeal, the sig-

lines the district court was correct. That evidence amply supports that determination. In its determination that the record provided no more than a general sense of the criteria for parole and detention the court was likewise correct. The evidence shows that the new policy announced in July, 1981, was never more than a general plan because INS and the Department of Justice failed to follow through with implementing regulations or guidelines.

### 4. *Unguided Discretion—Implementation of the Policy*

The most significant and telling testimony was that dealing with the transfer of authority to those responsible for implementing the new policy. The testimony indicates no one in the chain of command from the Attorney General to the immigration officers at Krome North, where the Haitians were detained, admitted to ever receiving or giving guidance as to who should be free and who should be incarcerated.

Guiliani, the Associate Attorney General, testified that parole decisions were to be made on a case-by-case basis. 49 Tr. 2318. He declined to answer specific hypotheticals based on individual factors because he believed there should be no general rule, but a careful consideration of all the facts. *Id.* at 2317–2326. He did state that if the policy were being applied in a discriminatory manner, that was contrary to the intent of the

Attorney General, and that the person who is doing it "should be reprimanded or dismissed, maybe." *Id.* at 2343.

Nelson, who followed Meissner as the Commissioner of INS, testified that district directors have primary responsibility for parole subject to general INS policy. 47 Tr. 1882. He adhered staunchly to the view that the district director, and not employees under him, should be responsible for the exercise of discretion in parole, subject to general guidelines, *id.* at 1968. Admitting that an Immigration Inspector might make the initial determination, Nelson nonetheless insisted:

> "the basic responsibility is in the district director. Certainly he would not delegate that across the board. The person on the scene such as the inspector would obviously advise the district director on various issues which would lead to the district director's determination.

*Id.* at 1967. Disclaiming knowledge of any specific case, Nelson testified that if discrimination in detention and parole was occurring, "I would very promptly get personal knowledge of that allegation." *Id.* at 1971–72.

Joe Howerton, the District Director in Miami and thus, according to Nelson and Guiliani, ultimately responsible for Haitian parole, testified that he was familiar with the general criteria as to parole, but because parole was a matter of discretion on

nificance of this statement relates to one government formulation of its policy, *i.e.*, that it only applied to those arriving aboard "non-signatory" carriers. This formulation, an attempt to distinguish the arriving Haitians from other illegal immigrants, suffers two difficulties.

First, it is unsupported by any evidence. One considerable body of statistical data employed by plaintiffs was extracted from the airport logs in District VI. Airlines are signatory carriers. As the detention policy clearly was being enforced at the airport, the "non-signatory" formulation can have no merit.

Second, as a constitutional matter the government's suggestion of this formulation is further evidence of intentional discrimination. Many immigrants enter this country illegally; almost none save the Cubans and Haitians arrive by "non-signatory" carriers. Some aliens

surreptitiously cross the border on foot. Others arrive aboard signatory carriers with false or fraudulent documents. The small unregistered boats ("non-signatory carriers") in which the Haitians arrive, however, according to the government formulation, were singled out for special treatment.

Though this case never reached the examination of a rational reason for the discriminatory treatment, because plaintiffs' prima facie case was unrebutted, some government witnesses suggested the "signatory"/"non-signatory" distinction was to prevent another Mariel boatlift. The effect of the line-drawing suggested by some, however, is to deter with one narrowly formulated rule the immigration of aliens we do not wish to have enter, while treating quite differently other classes of equally "illegal" immigrants.

the part of the person granting parole, he "could not attest to [the criteria] in any individual case." 48 Tr. 2159. In his deposition he testified he had "delegated down" his authority. Howerton Dep. at 12. At trial he said he had delegated his parole authority to his assistant director Alan Mac-Atee, 48 Tr. 2156, then under cross-examination admitted he had to assume MacAtee had further delegated the authority to the people at the airport because MacAtee was not at the airport, and that was where parole occurred. *Id.* at 2157. Parole authority at Krome, where many Haitians were detained, was delegated to Mr. Leonard Rowland, and Howerton was unaware if there were further subdelegations. He did state he never received guidelines as to parole after July 30, 1981 and denied there was a policy change other than in detention space. *Id.* at 2180–90. As to the Presidential announcement on July 30, 1981, Howerton stated "many people continue to make announcements but that doesn't necessarily reflect a policy change." Howerton Dep. at 19.

Rowland, to whom Howerton's parole authority at Krome was delegated, was deposed prior to trial. Rowland admitted he had not personally reviewed each individual case, Rowland Dep. at 86. Nor did he ask anyone else to review each case for parole. *Id.* at 95. Instead, he had his employees review files to see if everything generally was in order, and assumed they would let him know if in the course of file maintenance an appropriate case for parole presented itself. *Id.* at 89–90.[12]

Although the district court did not dwell on this delegation, or lack of it, and lack of communication of the policy, Judge Spellman did note "inconsistencies between what the government witnesses said the policy was and the policy their subordinates were carrying out." These inconsistencies the

court attributed to "the absence of guidelines for detention and parole." *Louis III* at 981 n. 24 (describing 15 year old boy in detention, separated from family in community).

In litigation that centers around a complex change in policy we find it significant that INS inspectors were authorized to perform the task of discretionary parole with a complete lack of guidance. It is clear no one knew exactly what the policy was, and no one in authority attempted to supervise the exercise of discretion under the new policy. Not surprisingly, the discretion was exercised with harsh results.

II. The Administrative Procedure Act

■ Count Two of the Haitian Refugee Center's complaint alleged the Administration's shift to the new policy was a "rule" within the meaning of § 551(4) of the Administrative Procedure Act ("APA"), and that the rule was established unlawfully because the Administration failed to comply with the procedural safeguards of 5 U.S.C. § 553(b) & (c). APA § 553 requires that an agency follow certain rulemaking procedures whenever it promulgates a "rule," unless a statutory exception to the rulemaking requirement applies. *See* 5 U.S.C. § 553(b)(A) & (B) (exempt rules); *Guardian Federal Savings and Loan Association v. Federal Savings and Loan Insurance Corp.,* 589 F.2d 658, 662 (D.C.Cir.1978) [hereinafter *"Guardian Federal"*]. Except in those instances when "on the record" rulemaking is required by statute, 5 U.S.C. § 553(c), an agency engaging in rulemaking must follow the "notice and comment" rulemaking provisions of APA § 553(b) & (c), which require that an agency provide notice of a proposed rule in the *Federal Register,* and afford an opportunity for interested persons to present their views.

■ The court below found the new policy was a rule within the meaning of APA

---

**12.** A case in point is Marie Puzo, an immigration inspector sent down by the eastern office in Burlington, Vermont, to help at Krome. Rowland Dep. at 88. Within the framework here presented Puzo was one of the immigration staff in whose hands the liberty of the Haitians ultimately rested. Rowland did not know, but assumed she studiously reviewed each file and in the course of her general review would let him know if she found a case for parole. She was a "very competent officer," *id.* at 90, and did tell him on two or three occasions when a case for parole presented itself. *Id.* at 90–91.

§ 551(4), *Louis III* at 993, and the government conceded that the policy was instituted without employing rulemaking procedures, *id.* at 993. The district court therefore held invalid the new policy, and ordered a return to the old policy, under which parole generally was granted. Then, relying on the old policy, the district court ordered release of the Haitian refugees incarcerated by the federal government.

On appeal the government argues first that the policy change was not a rule. APA § 551(4) defines a rule as "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy . . . ." The district court applied this definition to the new policy and found the change in policy was "clearly" a rule. We conclude the district court was correct; careful analysis of the APA shows the government's argument to be without merit.

### A. *Rulemaking*

 The APA establishes procedures governing the conduct of administrative agencies. The structural approach of the APA is to divide all the world of administrative action into two categories; an agency either issues an "order" by "adjudication" or a "rule" by "rulemaking." *Guardian Federal, supra,* 589 F.2d at 663; *Independent Bankers Association of Georgia v. Board of Governors of the Federal Reserve System,* 516 F.2d 1206, 1215 & n. 25 (D.C. Cir.1975); *see U.S. Dept. of Justice, Attorney General's Manual on the Administrative Procedure Act* 12–13 (1947) [hereinafter "Attorney General's Manual"] (setting

forth distinction between rulemaking and adjudication; definition of adjudication largely residual one based on rulemaking definition); *id.* at 126 (Appendix to Attorney General's Statement) (basic scheme of APA is to classify *all* administrative proceedings into two categories, rulemaking and adjudication).[13] *See generally* Schwartz, *Administrative Law* 143 (1976) (APA based on fundamental dichotomy between rulemaking and adjudication).[14]

Given the dichotomous structure of the APA, the Administration's new policy must be a rule or an order. The district court applied the definition of a rule set forth in § 551(4) and found that the policy change fell squarely within that definition. We agree an announcement that INS will universally enforce a detention policy while limiting parole is "an agency statement of general . . . applicability and future effect designed to implement, interpret, or prescribe law or policy . . . ," in other words, a rule. The government attacks this approach as simplistic, yet it is exactly what the Administrative Procedure Act requires.

A similar issue was before us in *American Trucking Association, Inc. v. United States,* 688 F.2d 1337 (11th Cir.1982), where we were asked to determine whether an action taken by the Interstate Commerce Commission (ICC) revoking all "special permission authorities"[15] was a "rule" within the meaning of APA § 551(4). Although the decision to grant or withhold a special permission authority in an individual case was discretionary in the ICC and required no recourse to notice and comment procedures, in *American Trucking* the ICC determined it would cancel *all* existing permission au-

---

**13.** "The courts have given deference to the interpretations of the Attorney General's Manual 'because of the role played by the Department of Justice in drafting the legislation.' *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.,* 435 U.S. 519, 546, 98 S.Ct. 1197, 1213, 55 L.Ed.2d 460 (1978)." *Guardian Federal,* 589 F.2d at 664 n. 21.

**14.** Recent cases acknowledge a third form of administrative activity—the investigative function—that is not covered by the APA. *See, e.g., Guardian Federal,* 589 F.2d at 663, and

cases cited therein, *id.* at n. 12. Even assuming the validity of the distinction, however, it is limited to administrative functions non-regulatory in manner and would not encompass the issues in this case, which are squarely within the regulatory realm of the INS.

**15.** A "special permission authority" is a finding of cause that permits the ICC to reduce a 30-day waiting period before a proposed rate change goes into effect. *American Trucking Association, Inc.,* 688 F.2d 1337 at 1347.

thorities and implied it would not issue any in the future. In a carefully reasoned opinion by the Chief Judge we held:

·While a decision in a particular case or cases to revoke a special permission authority would not be rulemaking, *the decision to reverse a longstanding and uniform practice by revoking all outstanding authorities* of a particular type and implicitly indicating that no such authorities will be issued in the future *is clearly a rule.*

688 F.2d at 1348 (emphasis supplied). This is the situation before us here. Although a decision to grant or deny parole in an individual case would not be rulemaking, the far-reaching policy announced by the government in this case, reversing the longstanding old policy and instituting the new policy "is clearly a rule." *Id.*

■ Despite the above authority the government argues that because the statute explicitly mandates detention, *see* 8 U.S.C. § 1225(b) ("shall be detained") and explicitly leaves parole decisions within the discretion of the Attorney General, *id.* § 1182(d)(5)(A) ("Attorney General may, . . . in his discretion parole"), no rule is required to enforce the statute. In other words, the government contends it is doing nothing more than implementing the express language of the statute. The government's argument, however, misses the mark; the fact that an agency need not employ rulemaking in order to exercise its discretion on a case-by-case basis does not mean it cannot or has not resorted to a rule of general applicability which limits its discretionary function. In the event there is resort to a rule, rulemaking is required. 5 U.S.C. § 553.

In this regard *Fook Hong Mak v. Immigration and Naturalization Service*, 435 F.2d 728 (2d Cir.1970), is instructive. In *Fook Hong Mak* appellant originally sought discretionary relief from the INS to prevent his deportation. His primary interest was

an adjustment of status so he could remain lawfully in the country, but under regulations adopted by the Attorney General Fook Hong Mak was precluded from consideration for such relief.[16] The INS therefore denied him adjustment of status, and granted a request for voluntary departure. Fook Hong Mak challenged this action, stating that "whether or not the Board would have been justified in denying his application for adjustment of status on the merits, the Attorney General's self-imposed restriction [in the regulations] on the consideration of it is unlawful." 435 F.2d at 730. Denying Fook Hong Mak's claims, Judge Friendly wrote, "[w]e are unable to understand why there should be any general principle forbidding an administrator, vested with discretionary power, to determine by appropriate rulemaking that he will not use it in favor of a particular class on a case-by-case basis. . . ." *Id.*

■ *Fook Hong Mak* stands for the proposition that an administrator vested with discretionary authority to act on a case-by-case basis may exercise that discretion by promulgating rules of general applicability. If the administrator does announce a general rule, however, rulemaking procedures must be followed. 5 U.S.C. § 553(b) & (c). *See also Texaco, Inc. v. Federal Power Commission*, 412 F.2d 740, 744–45 (3d Cir.1969) (crucial fact not whether burden could be imposed in *ad hoc* order, but whether agency elected to proceed with general rule). Here the court below found the new policy to be a rule and we concur in that determination. Whether the statute allowed INS to exercise its discretion on a case-by-case basis without rulemaking is irrelevant; once a rule of general applicability was employed rulemaking was required. *Cf. Fook Hong Mak*, 435 F.2d at 730. Unless a specific exception to the rulemaking requirement of § 553(c) applies, therefore, it was error for the government to proceed to detain immigrants on the basis of the

---

**16.** The regulations applicable in *Fook Hong Mak* provided that aliens who obtained admission without a visa as being in immediate and continuous transit through the United States should not be eligible to apply for adjustment of status. 435 F.2d at 729. Fook Hong Mak fell into that class of ineligibles.

new policy without adhering to rulemaking procedures.

## B. *Rulemaking Exceptions*

Complementing the broad definition of "rule" in § 551(4) the APA provides a number of exceptions that permit promulgation of certain rules without recourse to the rulemaking procedures. *See* 5 U.S.C. §§ 553(a); 553(b)(A) & (B). The government urges that three of these exceptions apply in this case: the foreign affairs function exception, 5 U.S.C. § 553(a)(1), the interpretative rule exception, *id.* (b)(A) and the exception for general statements of policy, *id.*

## 1. *The "Foreign Affairs" Exception*

APA § 553(a)(1) exempts from notice and comment rulemaking those rules involving "a military or foreign affairs function of the United States." The legislative history of § 553(a)(1) indicates the exception should be construed narrowly to include only those " 'affairs' which so affect relations with other governments that, for example, public rulemaking provisions would clearly provoke definitely undesirable international consequences." S.Rep. No. 752, 79th Cong., 1st Sess. 13 (1945). The district court found nothing in the record to support a finding that promulgation of the new parole policy would have resulted in "undesirable international consequences." *Louis III* at 996.[17] The court opinion stated: "At best, the connection between the detention policy and this country's conduct of foreign affairs is tenuous and certainly not substantial enough" to fit within the exception of 5 U.S.C. § 553(a)(1). *Id.* We agree.

Despite a dearth of case law on the exception embodied in § 553(a)(1), what precedent there is supports the district judge's conclusion that application of the exception in this case would distend that

exception beyond the scope intended by Congress. *See Yassini v. Crosland,* 618 F.2d 1356 (9th Cir.1980) (though immigration matters typically implicate foreign affairs court applied exception in light of extraordinary circumstances). The case *sub judice* readily is distinguishable from cases relied upon by the government. For example, in *Yassini* the court found an INS directive rescinding deferred departure for Iranian students to be within the foreign affairs exception on the basis that the Commissioner of the INS was "implementing the President's foreign policy." 618 F.2d at 1361. The court there found the challenged directive was part of the Administration's response to the November 4, 1979, takeover of the United States Embassy in Tehran. On November 10, 1979, in reaction to the takeover, the President directed the Attorney General to identify Iranian nationals not in compliance with the terms of their entry visas, and to take steps to deport those who violated immigration laws. *Id.* at 1359.

The directive at issue in *Yassini* was related intimately to the foreign policy of this country. At the time the directive issued Iranian militants held American nationals hostage at our embassy in Tehran, and the President was struggling to obtain their release. Actions taken by the Commissioner of the INS were in direct response to those release attempts. In its opinion the *Yassini* court noted "[a] rule of law that would inhibit flexibility of the political branches should be adopted with only great caution and judicial review of decisions made by the congress or the President in this area is limited." 618 F.2d at 1360.

This case does not involve sensitive foreign policy issues of a magnitude similar to those in *Yassini. See also Nademi v. INS,* 679 F.2d 811, 814 (10th Cir.) (visa regulations for Iranian nationals during embassy takeover; specific delegation from President to Attorney General to aid resolution

---

**17.** The court below not only found nothing in the record to support a finding of undesirable consequences stemming from publication of the new policy, it believed "[t]o the contrary, publication may have enhanced the deterrent

effect of the new policy and deterrence is one of the goals the Government sought to attain by initiating the detention policy." *Louis III* at 996.

of crisis), *cert. denied,* —— U.S. ——, 103 S.Ct. 161, 74 L.Ed.2d 134 (1982); *Malek-Marzban v. INS,* 653 F.2d 113, 116 (4th Cir.1981) (voluntary departure regulations for Iranian nationals in face of embassy takeover). The government at trial offered no evidence of undesirable international consequences that would result if rulemaking were employed. It argues only that the new policy touched on national sovereignty because, in the course of developing the policy, the President requested and received international cooperation. Certainly many issues with which the President deals involve national sovereignty; not all would have undesirable international consequences if rulemaking procedures were followed. Not every request for international cooperation seriously may be called "foreign policy." In light of Congress' intention that this exception receive limited application the district court correctly found the exception inapplicable.

### 2. *Interpretative Rules*

APA § 553(b)(A) exempts from the requirements of notice and comment rulemaking "interpretative rules," and "general statements of policy." The district court correctly observed that although the categories differ the APA provides little guidance as to those differences. The government urges that the policy change at issue here is an "interpretative rule or general statement of policy," yet fails to distinguish between them and offers legal argument only for the conclusion that the policy change is a general statement of policy.

■ The *Attorney General's Manual* defines "interpretative rule" as an "agency's construction of the statutes and rules which it administers." *Id.* at 30 n. 3. Courts further define the term to mean "statements as to what the administrative officer thinks the statute or regulation means." *Chamber of Commerce v. Occupational Safety and Health Administration,* 636 F.2d 464, 469 (D.C.Cir.1980); *Citizens to Save Spencer County v. Environmental Protection Agency,* 600 F.2d 844, 875 (D.C. Cir.1979). Interpretative rules are a "clari-

fication or explanation of existing laws or regulations rather than a substantive modification [of existing regulations] or adoption of new regulations," *Brown Express, Inc. v. United States,* 607 F.2d 695, 700 (5th Cir.1979) (citation omitted). Perhaps the most significant factor is that interpretative rules are non-legislative, in that they are promulgated without the exercise of delegated authority to create new law. *See American Trucking Association,* 688 F.2d 1337 at 1341 (11th Cir.1982).

■ The announced new policy does not fit comfortably within any of the aforementioned qualifications. It goes further than "explanation" or "clarification" and states a new future course of action. The district court apparently agreed; it set forth the law concerning interpretative rules but drew no conclusion, proceeding instead to examine the rule as a general statement of policy. Because the government offers no support for application of the interpretative rule exception, analyzing the new policy only as a general statement of policy, and because we believe analysis as an interpretative rule inappropriate here, we also proceed to the general statement of policy exception.

### 3. *General Statement of Policy Exception*

The government argues finally that the new policy falls within the exception in APA § 553(b)(A) for "general statements of policy." The district court found the exception inapplicable. Although the law in this area is less than clear, we believe the district court applied the incorrect test, yet reached a correct conclusion.

■ The court below rested its determination that the new policy was not a general statement of policy on two grounds. First, the district court found the immediate impact of the new policy significant.

> Clearly, the new detention policy is not a general statement of policy that INS hopes to implement in the future. It is being implemented right now! Nor does it set a goal that future proceedings *may* achieve, for the change has been present-

ed as a *fait accompli.* Immediately upon its effective date the former practice of freely paroling Haitians into the community ceased and a new policy paroling only humanitarian cases began. Thus, the new criteria for release is not exempt from APA requirements as a "general statement of policy."

*Louis III* at 996–97 (emphasis in original). Although some cases offer support for "immediacy" as a factor, *see Pacific Gas & Electric Co. v. Federal Power Commission,* 506 F.2d 33, 38 (D.C.Cir.1974) (general statement of policy is an announcement to public of policy agency hopes to implement in future rulemakings); *Brown Express, Inc. v. United States,* 607 F.2d 695, 701 (5th Cir.1979),[18] we do not believe this is the determinative consideration. Nothing in the statutory phrase "general statement of policy" requires or even suggests that to fall within the exception the policy must take effect in the future. As Professor Davis recognizes, it is a general statement of policy to announce: "[o]ur general policy always has been and still is . . . ." *Davis Supp.* § 7.5, p. 169.[19]

Second, the district court relied upon a determination that the policy at hand had a "substantial impact" upon the incarcerated Haitians. The court applied its "substantial impact" test largely in reliance upon the decision in *Brown Express, Inc. v. United States,* 607 F.2d 695 (5th Cir.1979). *Louis III* at 997. This reliance was misplaced. A careful reading of *Brown Express* indicates that opinion did not apply a substantial impact test to the general statement of policy exception. 607 F.2d at 701. The "substantial impact" test was used by the *Brown Express* court to determine whether a rule was "substantive" or "procedural," in order to determine whether the rule there at issue fell within a separate and distinct rulemaking exception. *Id.* at 702. *See* 5 U.S.C. § 553(b)(A) (rules of agency organization, procedure, or practice). *See also American Trucking* at 1351 (this court has never applied substantial impact test to interpretative rules though we did apply it to procedural rules in *Brown Express*). *But see American Trucking, supra* at 1351 (courts usually do not distinguish between § 553(b)(A) exceptions in applying substantial impact test). Further, our recent opinions call into question application of the substantial impact test to any rulemaking exception. *See id.* at 1352 & n. 20.[20]

---

**18.** Because *Brown Express* was decided by the Former Fifth Circuit we are bound by its holdings. *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc).

Our decision is not inconsistent with the *Brown Express* opinion. We do note the holding of *Brown Express* is not that immediacy deprives a rule of general statement of policy status, but that "[a]n announcement stating a change in the method by which an agency will grant substantive rights is not a 'general statement of policy' ". 607 F.2d at 701. That does not tell us what a general statement of policy *is,* only what it *is not.* We note further the rationale of *Brown Express* has come under attack recently by both court and commentator. *See Davis Supp.* § 7.4, at 166. (*Brown Express* is a gold mine of ideas "that mostly are contrary to established law"). At least one other panel of this circuit has described difficulties with the underlying reasoning of that opinion. *See American Trucking, supra,* 688 F.2d 1337 at 1351.

**19.** As to the immediacy requirement Professor Davis offers the following:

. . . a statement may be one of general policy, even though it is limited to past and present policy and says nothing about future or prospective policy.

The trouble stems from the Attorney General's Manual (1947), which in a footnote at page 30 said: '*General statements of policy* —statements issued by an agency to advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power.' That is all the Manual said; it did not say that a statement about policy which is general is not a general statement of policy if it is not prospective.
*Davis Supp.* § 7:5 at 170.

**20.** In *American Trucking* Chief Judge Godbold stated "[t]here are significant theoretical difficulties in applying the substantial impact test, however, and therefore we avoid endorsement of it at this time." In a note to the first clause of that sentence he explains those theoretical difficulties, 688 F.2d at 1352 n. 20. We quote that footnote in its entirety:

The substantial impact test is typically reasoned under two different theories: as a gloss on the statutory exception for "interpretative" rules, the *statute* requires notice and comment even though a rule is "interpretative" if it has substantial impact; as a judi-

■ We here conclude that the substantial impact test is insufficient to determine whether a rule is a general statement of policy. Policy statements often have a substantial impact, the more general, the more substantial. As Professor Davis notes, commenting upon the Second Circuit decision in *Noel v. Chapman,* 508 F.2d 1023 (2d Cir.), *cert. denied,* 423 U.S. 824, 96 S.Ct. 37, 46 L.Ed.2d 40 (1975), discussed *infra:*

> Even if fairness to the aliens in the *Noel* case may have called for § 553 procedure before the INS changed the practice of the New York district director to the disadvantage of the aliens, still the element of seeming unfairness may stem much more from Congress than from the court, for § 553 does exempt "general statements of policy" from the procedural requirements and thereby authorizes the most crucial policy determinations to be made without the procedure of notice and written comments.

In all fairness to the district court, analyzing a rule within the general statement of policy exception is akin to wandering lost in the Serbonian Bog. *See Guardian Feder-*

al, 589 F.2d at 668 (matters concerning application of exception to case not wholly free from doubt); *Noel v. Chapman,* 508 F.2d at 1030 (general statement of policy exception enshrouded in considerable smog); *Davis,* § 7.5 p. 32 (area confusing; perhaps only Congress can correct the confusion). The term itself—"general statement of policy"—offers little guidance. The new policy at issue was a "statement," was by its terms "general," and it was a matter of "policy," but if this were all the analysis required many more rules would qualify under the exception and fewer courts would find the area a morass. The legislative history offers little guidance. *See Davis* § 7.6, p. 32. The Supreme Court has yet to offer a definitive test. Courts that have addressed the issue present any number of ideas as to what constitutes a general statement of policy; the ideas often are intuitive, with little foundation in the statute or legislative history.

■ Given some of the confusion in this area we approach our analysis with basic principles concerning rulemaking. In *Guardian Federal* the District of Columbia

cially-created procedural requirement, notice and comment procedures are imposed *in addition to* the requirement of the APA if demanded by fundamental fairness. *See Davis Treatise, supra,* at § 7:18. The first theory has been criticized as unsound. *Id.,* 1982 Supplement at 127 (criticizing *Brown Express, supra*); *Administrative Law of the Seventies, supra* at 193. The second theory is put in doubt by the Supreme Court's decision in *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.,* 435 U.S. 519, 524, 98 S.Ct. 1197, 1202, 55 L.Ed.2d 460 (1978), where it stated that courts may add on to the APA procedural requirements only in "extremely rare" or "extremely compelling" cases. *See Energy Resources Group, Inc. v. Department of Energy,* 589 F.2d 1082, 1096–98 (Emer.Ct.App. 1978) (holding that *Vermont Yankee* precludes substantial impact test); *Davis Treatise, supra,* at §§ 6:35–36, 7:19 and 1982 Supplement at 127–47 (attempting to write off the *Vermont Yankee* "dictum").

In addition to the two principal theories it is also possible that the substantial impact test is not distinct from the initial determination of whether a rule is "interpretative" but is subsumed within this determination as a factor in determining whether a rule is "legis-

lative." *See* discussion in text preceding note 11 *supra.* If this is the only role of the substantial impact test it has a much decreased significance, for as explained above the substantial impact of a rule is only one, weakly relevant consideration in the legislative rule determination. *Id.*

The enunciated criticisms apply equally here, perhaps more so because the third theoretical underpinning is entirely unjustified.

Despite acknowledgment of difficulties with the test, the *American Trucking* opinion assumes "*arguendo* that this approach is applicable" and that the rule in question does not have substantial impact. *Id.* We could do the same, *see Noel v. Chapman,* 508 F.2d 1023, 1030 (2nd Cir.1975) ("so-called" substantial impact test not determinative of general statement of policy at issue because policy announcement only a guide for, but does not control discretion), but decline to extend precedent generally recognized to rest on a questionable foundation. Nor is it necessary for us to do so, because no precedent in this circuit applies the "substantial impact" test to general statements of policy. Instead, we set out in the text of this opinion the factor we believe the statute does mandate considering in identifying a general statement of policy.

Circuit set forth succinctly the benefits of notice and comment rulemaking:

> This public participation assures that the agency will have before it the facts and information relevant to a particular administrative problem, as well as suggestions for alternative solutions. Public rulemaking procedures increase the likelihood of administrative responsiveness to the needs and concerns of those affected. And the procedure for public participation tends to promote acquiescence in the result even when objections remain as to substance.

589 F.2d at 662. The exceptions to the rulemaking requirement, on the other hand, come into play when the benefits of public rulemaking procedures are outweighed by other considerations, or when no benefits accrue to the use of the rulemaking procedures. The District of Columbia Circuit noted in *Guardian Federal* that the exceptions "accommodate situations where the policies promoted by public participation in rulemaking are outweighed by the countervailing considerations of effectiveness, effi-

ciency, expedition, and reduction in expense. *Id.* at 662. Therefore, despite the preferential position of rulemaking in the APA, *see American Bus Association v. United States,* 627 F.2d 525, 528 & n. 2 (D.C.Cir.1980) (salutary effect of rulemaking procedures cannot be gainsaid; exceptions should be noted reluctantly), there are instances when Congress intended the balance to shift the other way.

In determining whether to apply a general statement of policy exception to a given rule one overriding factor frequently relied upon by courts addressing the issue strikes the balance enunciated above. That factor addresses the extent to which the challenged policy leaves the agency, or its implementing official, free to exercise discretion to follow, or not follow, the general policy in an individual case. Often referred to as examining whether the policy establishes "a binding norm," [21] the issue is whether the policy so fills out the statutory scheme that upon application one need only determine whether a given case is within the rule's criterion.[22] The signifi-

---

**21.** *Guardian Federal, supra,* 589 F.2d at 666. At issue in *Guardian Federal* were regulations specifying the criterion that audits and auditors were required to fulfill in order to produce an audit satisfactory to the FSLIC. The *Guardian Federal* court held that the regulations at issue were within the general statement of policy exception, relying upon two familiar factors.

First, in enunciating the critical test of whether a rule was a general statement of policy the court stated: A general statement of policy does not establish a 'binding norm.' It is not finally determinative of the issues or rights to which it is addressed." 589 F.2d at 666 (quoting *Pacific Gas & Electric Co. v. FPC,* 506 F.2d 33, 38 (1974)). Second, the District of Columbia Circuit found that the regulations at issue effectively preserved the Administrator's discretion. Although the regulation set forth criterion to be followed, the "Chief Examiner has discretion to accept a non-conforming audit report, or for that matter to prescribe additional requirements in a particular case," *id.* The court then stated the second test: "[i]f it appears that a so-called policy statement is in purpose or likely effect one that narrowly limits its administrative discretion, it will be taken for what it is—a binding rule of substantive law." The test set forth in *Guardian Federal* is in large part the one we adopt. We have attempted, however, to develop the underlying rationale.

**22.** *See Pinkus v. United States Board of Parole,* 507 F.2d 1107, 1113 (D.C.Cir.1974) (parole criteria so "narrow [decisionmaker's] field of vision that in effect they limit influence of any other factors); *Guardian Federal, supra,* 589 F.2d at 666 (general statement of policy must leave administrator free "to exercise his informed discretion in situations that arise"); *Parco v. Morris,* 426 F.Supp. 976, 985 (E.D.Pa. 1977) (not a general statement of policy when rule purports to grant discretion but has result of *all* cases being resolved in one manner). This case is unique to the extent that the statute being "filled in" by the policy statement has as a standard the "discretion" of the Attorney General. *See* 8 U.S.C. § 1182(d)(5)(A) (Attorney General may, in his discretion, parole aliens). Other cases express this concept of a "binding norm" differently, for example describing the alleged policy as "imposing rights and obligations" on the party before the agency. *Texaco v. FPC,* 412 F.2d 740, 744 (3d Cir.1969) (waiver provision no substitute for informed discretion; rule at issue finally determines rights and obligations). The ultimate concern, however, is that the agency, despite its announced policy, be free to consider on their facts the cases that arise, without constraint of the "policy."

cance of this factor is that it reveals whether, if objections to the rule cannot be voiced through notice and comment rulemaking at the time of promulgation, there will be a subsequent opportunity to object to a specific application of the rule. If an agency, or its official, is bound to apply an airtight rule in a given case it is important to allow specific objections prior to promulgation, lest these objections be forfeited. If, however, a sufficiently general rule guides the agency's decision, but application of the rule to a unique set of facts is subject to challenge, prior opportunity to object is less important and the balance may mitigate against notice and comment rulemaking.[23]

Here, measuring the new policy by this standard, we find the balance is struck in favor of notice and comment rulemaking. We so hold because of the peculiar facts of this case. This is not a case where a policy was developed and announced at the highest level of government, and implemented in accord with that announcement. Those who formulated the policy failed to convey the policy to those responsible for implementing it. Left without guidance as to how to implement an undefined policy, the immigration inspectors enforced the detention policy as if it was intended to apply solely, and uniformly, to Haitians.

■ We are faced with the choice of analyzing either a policy ranking immigration officials insist they adopted, or one their subordinates believed they were responsible for implementing.[24] The latter presents the only sensible approach. Though the genesis of discriminatory enforcement may have been only a failure to clarify a general policy, the reality is that "the absence of guidelines for detention and parole" accounted for "inconsistencies between what the Government witnesses said the policy was and the policy their subordinates were carrying out." *Louis III* at 981 n. 24. Those subordinates implemented a policy which led to widespread incarceration of the Haitians, humanitarian cases or otherwise.[25] A broad rule of detention with undefined exceptions is susceptible to rigid enforcement with no opportunity to avoid the rule's harsh results.[26] Such a rule can-

---

**23.** An example emphasizes this point. Consider the case of an fifty-year old undocumented male immigrant with a severe heart condition, examined in light of two possible formulations of a parole policy. Under the first hypothetical formulation INS determines it will detain all undocumented immigrants unless they are (1) under six years of age, (2) over 60 years of age, or (3) pregnant. Under the second formulation INS determines it will detain all undocumented immigrants unless there are "significant humanitarian reasons." The first formulation does not allow for discretionary relief from the general rule. Under the second formulation the standard—"significant humanitarian reasons"—is so broad that the agency official is free to grant relief.

**24.** We presume the policy as applied by immigration inspectors was the policy they believed their superiors intended them to apply. We have no basis for believing the immigration inspectors responsible for implementing the new policy did so in a manner deliberately contrary to what their superiors required. What happened here strikes us as analogous to the children's game "telephone," where a child at the start of the line whispers a phrase in the ear of the child beside him, and so on down the line. Inevitably, the phrase uttered by the last child in line bears little resemblance to the original phrase. Here the Administration an-

nounced a policy in the most general of terms; without explicit instruction, however, that policy was implemented in a specific discriminatory .nanner. There is no evidence that the subordinates were instructed they were applying an unintended policy.

**25.** The record indicates not all Haitians were denied parole. It is impossible to determine on the record, however, the basis for granting parole in some cases and denying it in others. Certainly it was not "humanitarian cases," *see supra* III, C, discussing failings of the evidence in this regard. To the extent grants of parole were arbitrary and unprincipled, the only identifiable "norm" was detention.

**26.** The Administration announced a broad policy of detention. The announcement, made in the context of Haitian immigration, failed to set out guidelines for discretionary parole. It is unsurprising that the message received by immigration officials responsible for implementing the policy was to detain Haitians. *See* I, D *supra* for a full explication of the policy announcement.

We emphasize we are not analyzing the effect of a policy, i.e. its impact, substantial or otherwise. The procedures of the Administrative Procedure Act are without value if it cannot be determined at the time of announce-

not be a general statement of policy; in truth it creates a binding norm.[27] Consequently, the general statement of policy exception is not applicable here. Because we conclude the new policy was not within any of the notice and comment rulemaking exceptions, we affirm the judgment of the district court as to Count II.

## III. Equal Protection of the Law

*We hold these truths to be self-evident, that all men are created equal, that they are endowed by their Creator with certain inalienable Rights, that among these are Life, Liberty and the pursuit of Happiness.*

*The Declaration of Independence (1776).*

Plaintiffs asserted below that the government violated their fifth amendment rights by enforcing its new policy in a discriminatory manner. The district court found the Haitians bore the brunt of the new policy to a degree greater than any other nationality at that time, *Louis III* at 1000, but concluded that "Defendants intended to be fair and that if another class of aliens arrived in this country in a situation similar to that of the Plaintiffs they would be treated in a similar

fashion." *Id.* at 1001. Holding plaintiffs failed to meet their burden of proof on the discrimination issue, the district court ruled in favor of the government.

### A. *General Principles*

#### 1. *Alien's Rights*

The district court initially addressed the question whether excludable aliens could raise an equal protection claim. Comparing pre-exclusion parole to a criminal defendant's right to pre-trial bond, the district court determined that class members could seek protection under the fifth amendment from discriminatory exercises of the parole power. We agree.

As we discussed *supra*, the excludable alien knocking at our door has few constitutional rights when seeking admission to this country. *Kwong Hai Chew v. Colding,* 344 U.S. 590, 596 n. 5, 73 S.Ct. 472, 477 n. 5, 97 L.Ed. 576 (1953) (Bill of Rights futile authority for alien seeking admission for the first time). Congress, exercising this nation's inherent rights of sovereignty, has plenary authority over the who and how of immigration—"[w]hatever the procedure authorized by Congress is, it is due process

ment, whether or not a rule is within the general statement of policy exception. The inherent nature of the broad detention policy announced by the government, with reference to Haitian immigration, was too readily susceptible to rigid discriminatory enforcement. This case is factually unique because the breadth of the new policy, a policy without guidelines for enforcement, accounted for its establishing a "binding norm."

**27.** The government directs our attention to *Noel v. Chapman,* 508 F.2d 1023 (2d Cir.), *cert. denied,* 423 U.S. 824, 96 S.Ct. 37, 46 L.Ed.2d 40 (1975). In *Noel* an INS statement limiting the discretion of the district director to grant the privilege of voluntary departure to deportable aliens was at issue. The New York district director of INS maintained a "more liberal" policy than the rest of the United States with respect to the suspension of deportation for illegal aliens married to permanent aliens. *Id.* at 1025. INS informed its district directors that, as of July 31, 1972, deportation dates should not be suspended except where compelling circumstances warranted the suspension. *Id.* The Second Circuit held that INS' announcement, the purpose of which was to bring

New York into line with the rest of the country, fell within the general statement of policy exception to the rulemaking requirements of the APA. *Id.* at 1030–31.

The Second Circuit enunciated several factors that supported its determination. First, it stated: "We cannot conclude that the instructions at issue here change the existing right of the appellants to have their applications for extensions of time to depart authorized in the sole discretion of the District Director." 508 F.2d at 1030. Second, the *Noel* court relies upon a statement by Judge Friendly that "'[o]ne of the values of the policy statement [is] *the education of agency members in the agency's work,*'" *id.* at 1030 (emphasis in original). The *Noel* court distinguished between statements directed at staff to explain how to conduct discretionary functions, and statements directed at the public to impose obligations upon them.

This case is distinguishable from *Noel.* Although those who originally announced the new policy may have intended it not to limit discretion, and to serve only to educate agency officials, we find those responsible for establishing the policy failed to convey its general nature.

as far as the alien denied entry is concerned." *Mezei, supra,* 97 L.Ed. at 963, 345 U.S. at 212, 73 S.Ct. at 629.[28] Just this term the Supreme Court reaffirmed this position, stating "[t]his Court has long held that an alien seeking initial admission to the United States requests a privilege and has no constitutional rights *regarding his application,* for the power to admit or exclude aliens is a sovereign prerogative." *Landon v. Plasencia,* —— U.S. —— at ——, 103 S.Ct. 321 at 329, 74 L.Ed.2d 21 (1982) (emphasis supplied).

At issue here, however, is not a right to admission and attendant procedures, but a right to be considered for parole in a non-discriminatory fashion. In this regard Judge Spellman noted "the [Supreme] Court has never held, ... 'the Constitutional guarantees of the Fifth Amendment do not extend to unadmitted aliens.'" *Louis III* at 998. Indeed, as early as 1885 the Supreme Court, discussing the scope of the Fourteenth Amendment, stated:

> The Fourteenth Amendment to the Constitution is not confined to the protection of citizens. It says: 'Nor shall any State deprive any person of life, liberty, or property without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.' These provisions are universal in their application, to all persons within the territorial jurisdiction, without regard to any differences of race, of color, or of nationality; and the equal protection of the laws is a pledge of the protection of equal laws.

*Yick Wo v. Hopkins,* 118 U.S. 356, 369, 6 S.Ct. 1064, 1070, 30 L.Ed. 220, 226 (1886) (emphasis supplied).

The problem here is the fiction that excludable aliens are not within the "territorial limits" of the United States. Though that fiction serves its purpose to limit the procedural rights of an excludable alien "regarding his application" for admission, *Lan-*

*don v. Plascencia, supra,* it strains credulity to maintain that an alien within our territorial limits may claim none of the rights accorded our citizens. And, indeed, in situations where excludable aliens within our borders have claimed deprivations of fundamental rights, the courts have been quick to respond. In *Rodriquez-Fernandez v. Wilkinson,* 654 F.2d 1382 (10th Cir.1981), the Tenth Circuit held "punishment" of excludable aliens was improper without the "substantive and procedural due process guarantees of the Fifth Amendment." "Surely Congress could not order the killing of Rodriquez-Fernandez and others in his status on the ground that Cuba would not take them back and this country does not want them." *Id.* at 1387. And, in *United States v. Henry,* 604 F.2d 908 (5th Cir.1979), the court held that an excludable alien is entitled to fifth amendment rights once criminal proceedings against him have commenced. *Id.* at 914. *See also Plyer v. Doe,* 457 U.S. 202, 210, 102 S.Ct. 2382, 2391, 72 L.Ed.2d 786 (1982) (whatever status is under immigration laws, undocumented alien is surely "person" in ordinary sense of word under fifth and fourteenth amendments) (deportable alien). *See generally* Note, *The Constitutional Rights of Excluded Aliens: Proposed Limitations on the Indefinite Detention of the Cuban Refugees,* 70 Geo.L.J. 1303 (1982).

Although the class members ultimately seek admission to this country, the present action does not "relate to admission and does not challenge Congress' power in that regard." *Louis III* at 34. In fact, though detention is the underlying predicate of this action, class members do not even question the right of Congress or the Executive to detain them. Rather, they challenge the discretionary exercise of the Executive's parole power when that power is exercised on the basis of race or national origin. Accordingly this action falls within

---

**28.** Relying on language in cases such as *Mezei,* the government argued below that excludable aliens have no fifth amendment rights to assert. The district court rejected this, as we note in our opinion, and the government does not spe- cifically challenge that determination. In light of the import of the issue, however, we address the merits and affirm the determination of the district court.

the rubric of such cases as *Yick Wo, Plyer, Henry* and *Rodriquez-Fernandez,* and differs from challenges to immigration procedures rejected in *Mezei* and *Knauff.*

Even were we unprepared to accord these aliens full equal protection rights we would be compelled to consider this discrimination claim. Our standard of review under *Mezei* and *Knauff* is to assure aliens receive that process Congress determined was due; on the record before us we can but determine that Congress intended the statutes under which the INS acted to be applied in a non-discriminatory fashion. This the district court explained:

It is important to note that the actions challenged herein are *not* Congressional. Plaintiffs allege the Defendants are applying a neutral statute in a discriminatory fashion. This distinction, between legislation and enforcement, is critical. *Congress* can legitimately make distinctions among and against aliens that would be unacceptable if applied to citizens, *Matthews v. Diaz,* 426 U.S. 67, 80 [96 S.Ct. 1883, 1891, 48 L.Ed.2d 478] (1976), but "[i]n the *enforcement of these policies,* the Executive Branch of the Government must respect the procedural safeguards of due process." *Galvan v. Press,* 347 U.S. 522, 530 [74 S.Ct. 737, 742, 98 L.Ed. 911] (1954) (Frankfurter, J.), cited in, *Faillo v. Bell,* 430 U.S. 787, 792 n. 4 [97 S.Ct. 1473, 1478 n. 4, 52 L.Ed.2d 50] (1977). (Emphasis added). "A statute, otherwise neutral in its face, must not be applied so as invidiously to discriminate on the basis of race. *Yick Wo v. Hopkins,* 118 U.S. 356, 369 [6 S.Ct. 1064, 1070, 30 L.Ed. 220] (1886)." *Washington v. Davis,* 426 U.S. 229, 241 [96 S.Ct. 2040, 2048, 48 L.Ed.2d 597] (1976).

*Louis III* at 998–99.

2. *Proof of Discrimination: the legal standard*

In *Washington v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976) and *Village of Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977) [hereinafter "*Arlington Heights*"] the Supreme Court held that plaintiffs challenging an action as discriminatory must go further than identifying a disparate impact and prove the challenged action was the product of discriminatory intent. 429 U.S. at 265, 97 S.Ct. at 563, 50 L.Ed.2d at 464; 426 U.S. at 240–42, 96 S.Ct. at 2047–49, 48 L.Ed.2d at 607–09. Recognizing that legislative and administrative actions are rarely motivated by one purpose only, the Court held plaintiffs must establish that the challenged decision was at least motivated in part by a discriminatory purpose. 429 U.S. at 266, 97 S.Ct. at 564, 50 L.Ed.2d at 465. *See also Personnel Administrator of Massachusetts v. Feeney,* 442 U.S. 256, 279, 99 S.Ct. 2282, 2296, 60 L.Ed.2d 870 (1979). Plaintiffs need not prove a discriminatory purpose was the primary, or dominant purpose, *Arlington Heights,* 429 U.S. at 266, 97 S.Ct. at 564, 50 L.Ed.2d at 465, but must show that the action taken was, at least in part, "because of," and not merely "in spite of" its adverse effects upon an identifiable group, *Feeney, supra,* 442 U.S. at 279 & n. 24, 99 S.Ct. at 2296 & n. 24.

The very nature of legislative and administrative action makes it difficult to ascertain the "intent" of the acting body. For that reason, in *Arlington Heights* the Supreme Court provided some examples of "circumstantial and direct evidence" that courts might properly consider in judging whether invidious discrimination permeated official action. First, there is evidence of "impact," i.e. whether the challenged activity "bears more heavily on one race than another," *id.* 429 U.S. at 266, 97 S.Ct. at 564, 50 L.Ed.2d at 465, *citing Washington v. Davis,* 426 U.S. 229, 241, 96 S.Ct. 2040, 2048, 48 L.Ed.2d 597, 608.[29] In cases where proof

---

**29.** A claim of discrimination based on nationality does not differ from that based on race. *See, e.g., Castaneda v. Partida,* 430 U.S. 482, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1976) (Mexican-Americans); *Yick Wo v. Hopkins,* 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886) (Chinese). Plaintiffs consistently have addressed this case as one premised both on nationality (Haitian) and race (black). The bulk of the evidence,

of impact alone is insufficient, where a stark pattern of discrimination is not evident, the courts should consider circumstantial evidence, which includes the following factors: (1) historical background of the decision, (2) the specific sequence of events leading up to the challenged decision, (3) departures from the normal procedural sequence, as well as substantive departures, and (4) legislative or administrative history. 429 U.S. at 265–66, 97 S.Ct. at 563, 50 L.Ed.2d at 464–66. And, because these factors are not exhaustive, *id.* 429 U.S. at 266, 97 S.Ct. at 564, 50 L.Ed.2d at 466, the list has been supplemented: (5) foreseeability of discriminatory impact, *Columbus Board of Education v. Penick,* 443 U.S. 449, 464–65, 99 S.Ct. 2941, 2950, 61 L.Ed.2d 666 (1979), (6) knowledge of discriminatory impact, *NAACP v. Lansing Board of Education,* 559 F.2d 1042, 1048 (6th Cir.1977), *cert. denied,* 434 U.S. 997, 98 S.Ct. 635, 54 L.Ed.2d 491 (1979), and (7) the availability of less discriminatory alternatives, *United States v. Board of School Commissioners of Indianapolis,* 573 F.2d 400, 413 (7th Cir.), *cert. denied,* 439 U.S. 824, 99 S.Ct. 93, 58 L.Ed.2d 116 (1978).

■ Once plaintiffs come forward with evidence sufficient to support a *prima facie* claim the burden shifts to the defendant, the government in this case, "to dispel the inference of intentional discrimination." *Castaneda v. Partida,* 430 U.S. 482, 497, 97 S.Ct. 1272, 1282, 51 L.Ed.2d 498, 512 (1977); *Castaneda v. Pickard,* 648 F.2d 989, 1003–04 (5th Cir.1981). Although the quantum of evidence required from the defendant is

unclear from the Supreme Court's decisions it is established that mere protestations of lack of discriminatory intent and affirmations of good faith will not suffice to rebut the prima facie case.[30] *Castaneda,* 430 U.S. at 499 n. 19, 97 S.Ct. at 1282 n. 19, 51 L.Ed.2d at 513 n. 19 (cases cited). A defendant must introduce evidence to support its explanations. *Castaneda,* 430 U.S. at 499 n. 19, 97 S.Ct. at 1282 n. 19, 51 L.Ed.2d at 513 n. 19. *Cf. Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 255 n. 9, 101 S.Ct. 1089, 1094 n. 9, 67 L.Ed.2d 207, 216 n. 9 (1981).

■ Finally, should the government succeed in rebutting plaintiffs' prima facie case, the trial judge must evaluate the weight of the evidence. It is inevitably the task of the trier of fact to decide whether plaintiffs have succeeded, in the face of the defendant's rebuttal, in proving, by a preponderance of the evidence, that defendant's actions were taken in part because of a discriminatory intent or purpose. *Cf. Burdine,* 450 U.S. at 252–53, 101 S.Ct. at 1093.

### 3. *The District Court's Findings*

We cannot determine precisely what the district court concluded as to the individual aspects of prima facie case, rebuttal, and ultimate proof. From the absence of any discussion of rebuttal it might appear the court below found insufficient proof to establish a prima facie case. We conclude differently, however, for the district court considered government arguments that are properly considered as rebuttal, if at all.

however, was addressed to the nationality claim.

**30.** In this portion of our opinion we rely upon a number of Title VII cases. Although the standard of proof in Title VII cases differs from that in constitutional equal protection cases, the framework for proving a case, *i.e.* prima facie case, rebuttal, ultimate proof, is the same. *See, e.g., Castaneda v. Partida,* 430 U.S. at 495–96, 496, 97 S.Ct. at 1280–81, 51 L.Ed.2d at 508, 511 (establishing prima facie case requiring rebuttal in jury discrimination case). Because of the similar framework, and because there are few

equal protection cases relying on statistics, when appropriate we draw upon Title VII cases. *E.g., Johnson v. Uncle Ben's, Inc.,* 628 F.2d 419, 424 (5th Cir.1980) (rebuttal includes existence of "legitimate nondiscriminatory reason" for defendant's action, or evidence of "total unacceptability of plaintiff's statistical evidence"), *vacated and remanded,* 451 U.S. 902, 101 S.Ct. 1967, 68 L.Ed.2d 290 (1981), *modified in part, rev'd in part,* 657 F.2d 750 (5th Cir. 1981), *cert. denied,* —— U.S. ——, 103 S.Ct. 293, 74 L.Ed.2d 277 (1982).

■ The government's case rested on two independent general arguments. The first attacked the validity of plaintiff's statistical evidence, and the second proffered explanations to dispel the appearance of disparate impact. Both government arguments are considered properly as rebuttal. *See Johnson v. Uncle Ben's, Inc.,* 628 F.2d 419, 424 (5th Cir.1980) (rebuttal includes existence of "legitimate nondiscriminatory reason for defendant's action, or evidence of "total unacceptability of plaintiff's statistical evidence"), *vacated and remanded,* 451 U.S. 902, 101 S.Ct. 1967, 68 L.Ed.2d 290 (1981), *modified in part, rev'd in part,* 657 F.2d 750 (5th Cir.1981), *cert. denied,* —— U.S. ——, 103 S.Ct. 293, 74 L.Ed.2d 277 (1982).

■ The prima facie case, however, is based solely on evidence presented by the plaintiff, and is evaluated to determine whether plaintiff could survive a motion to dismiss at the close of its case. *See Burdine,* 450 U.S. at 253–55, 101 S.Ct. at 1093–95, 67 L.Ed.2d at 215–16 (Title VII); *cf. Marine Midland Bank, N.A. v. Miller,* 664 F.2d 899, 904 (2d Cir.1981) (prima facie showing of personal jurisdiction established on basis of plaintiff's affidavits and materials); *White v. Abrams,* 495 F.2d 724, 729 (9th Cir.1974) (prima facie case is sufficient evidence for plaintiff to survive motion to dismiss or motion for directed verdict; plaintiff must present evidence sufficient to require defendant to present its case); *Warner v. KeWanee Machinery & Conveyor Co.,* 411 F.2d 1060, 1063 (6th Cir.1969) (prima facie case evaluated to see if plaintiff's evidence raises issue for jury). We are convinced that if the prima facie case were segregated from rebuttal and ultimate proof the district judge would conclude, as we do, that this preliminary burden was met. The statistical evidence presented by plaintiffs, *see infra,* disclosed a stark pattern of discrimination. We are not overly concerned at this juncture, however, with the district court's failure to separate preliminary and final burdens. It may have

been impossible to categorize the evidence, as was the case in *Equal Employment Opportunity Commission v. Datapoint Corp.,* 570 F.2d 1264, 1268 (5th Cir.1978), where we noted:

> However, in this case the failure of the trial court to expressly make such determination is not material as plaintiff's proof and defendant's rebuttal are completely interwoven. In this case the very statistics relied upon by plaintiff to establish a *prima facie* case formed the basis of defendant's rebuttal of it, i.e. that the statistics were not reliable.

Further, the district court correctly identified the ultimate burden upon the plaintiff, to prove intentional discrimination by a preponderance of the evidence. *Cf. Burdine,* 450 U.S. at 252–53, 101 S.Ct. at 1093. The district court concluded plaintiffs failed to meet this burden.

■ Although concurring in the proper legal standard, we disagree with the district court on a plethora of subsidiary issues. Specifically, once we examine the conclusions made by the court below as to the government's arguments, it is apparent as a matter of fact and law that the government failed to rebut plaintiff's evidence of discrimination. Accordingly, we proceed to consider those issues in dispute.

## B. *Plaintiffs' Case*

### 1. *"Impact"*—The Statistical Evidence

At trial plaintiffs introduced a wealth of statistical evidence to show the vastly disproportionate impact of the government's detention policy on Haitian, as opposed to non-Haitian, immigrants. *See Arlington Heights,* 429 U.S. at 266, 97 S.Ct. at 564, 50 L.Ed.2d at 465; *Castaneda v. Partida,* 430 U.S. at 494–96, 97 S.Ct. at 1280–81, 51 L.Ed.2d at 510–11. Additional statistical evidence from a New York case, *Bertrand v. Sava,* 684 F.2d 204 (2d Cir.1982), was introduced to show that certain factors suggested by the government to explain the disparate impact, such as family ties or

documentation, bore little relation to chance of parole.[31] Plaintiffs then offered the testimony of Dr. Howard Seth Gitlow, Professor of Statistics, to explain the statistical significance of the data.

The test here employed is not so confusing as the parties make it appear, nor is it unfamiliar in cases of this nature. *See Castaneda v. Partida,* 430 U.S. at 496–97 n. 17, 97 S.Ct. at 1281 n. 17, 51 L.Ed.2d at 512 n. 17 (application of standard deviation analysis). Dr. Gitlow employed binomial analysis to statistics showing Haitians versus non-Haitians detained and paroled. The purpose of this test is to show how many Haitians one would expect to find detained or paroled based upon the government's treatment of non-Haitians.[32]

The standard deviation, a final expression of binomial analysis, is nothing more than a measure of the difference between the predicted number and the actual number. "As a general rule for [ ] large samples, if the difference between the expected value and the observed number is greater than two or three standard deviations," then we suspect an unexplained factor, in this case discrimination, is responsible for the difference. *See Castaneda v. Partida,* 430 U.S. at 496–97 n. 17, 97 S.Ct. at 1281 n. 17, 51 L.Ed.2d at 512 n. 17.

The statistical evidence offered by plaintiffs and analyzed by Dr. Gitlow came from three specific sources. The first source was the secondary inspection logs at the airport in Miami between August 1981 and April 1982. Secondary inspection occurs if upon initial encounter with an Immigration offi-

cer there is some doubt as to an individual's right to enter. For comparison this evidence was compiled in two separate time frames. Plaintiff's exhibit 187 reflected secondary inspection between August and December, 1981, and separated the statistics for both Haitians and non-Haitians into "paroled," "paroled for exclusionary hearing," "deferred inspection" and "detained."

Dr. Gitlow then testified concerning the binomial analysis performed with the statistics. He computed standard deviations based on three separate compilations, each collapsing the parole categories in a different way in order to ensure no method more accurate than another was neglected. Dr. Gitlow found in each of the three compilations that the chance of so many more Haitians than non-Haitians being detained, or so many fewer Haitians paroled was "on the order of less than two in ten billion times." 53 Tr. 2948. In some cases it was "far less than one in ten billion," *id.* at 2949, or "a statistical joke." *Id.* at 2950.

The second set of data, provided by the government, was from INS District VI, which encompasses the south Florida region. The data reflected persons placed in exclusion proceedings or in an exclusion category who sought entry between the period August 1, 1981 and November 1, 1981. The data was coded by nationality, documentation, attempted entry, date of parole, length of detention, whether an asylum claim was filed, family ties, and comments. *See* Px 189.

Dr. Gitlow provided binomial analysis on a number of compilations of the District VI

---

**31.** The government objected to the evidence from *Bertrand v. Sava,* 684 F.2d 204 (2d Cir. 1982), and the opinion below, on the grounds that the populations compared to prove discrimination were not comparable. Plaintiffs introduced evidence, however, to refute government arguments concerning relevant factors in a parole determination. In this regard the Second Circuit's reversal of the district court in *Bertrand v. Sava* supports, rather than harms, the plaintiffs' case. *See* discussion *infra* at 1498–1499.

**32.** Binomial analysis takes the number of non-Haitians paroled out of a given universe, computes this as a percentage, multiplies that percentage with the total Haitians in the universe and compares this final number with the Haitians actually paroled. When those numbers differ it raises the presumption that a non-random factor, in this case discriminatory intent, was at work in determining who should be detained or paroled.

data.[33] Plaintiffs also built "worst-case scenarios" in which they progressively biased the figures in favor of the government.[34] The purpose of the extensive analysis of the District VI data was to evaluate not only detention versus parole, but also length of time in detention prior to release or final determination. Dr. Gitlow again could only explain the disparate impact of the new policy in a random world as "remote," "statistically significant," or a "statistical joke." *See* 53 Tr. 2951–68. In all of these cases Dr. Gitlow declined to calculate the standard deviation because "it would be so large that my calculator would not hold the numbers." *See e.g.,* 53 Tr. 2965.

Because the government contended, as we discuss *infra,* that the statistical evidence failed to take into account certain "significant" factors, Dr. Gitlow next performed multivariate, or Chi-squared, analysis on the District VI data to control for one of those "significant" factors, that being documentation status. Out of the twenty or more different tests performed only one result fell outside the "suspect" levels of *Castaneda v. Partida,* while most standard deviations were twenty or greater.[35]

The third data set examined was from the government's computer system at Krome North. This data covered detention and parole for a period between January and April 1982. Plaintiffs introduced this evidence with "strong reservations with respect to the data," 53 Tr. 3040, because they never saw the underlying figures and were aware the computer did not include the entire relevant population. Nonetheless, the lowest standard deviation calculated by Dr. Gitlow was 7.64, well outside of the *Castaneda* "two or three standard deviations" range.

Finally, Dr. Gitlow analyzed statistics introduced by the government. During the course of the government's testimony, plaintiffs raised serious questions as to the validity of that data. *E.g.,* 54 Tr. 3176–78. Nevertheless, Dr. Gitlow's testimony concerning the statistics was every bit, if not more, damaging than his testimony concerning plaintiffs' statistics. *See* 54 Tr. 3251 et seq.

Plaintiffs' statistical evidence showed a severely disproportionate impact upon the plaintiff class. We venture to say that this impact revealed a "pattern [of discrimination based on nationality] as stark as that in *Gomillion* [*v. Lightfoot,* 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960);] or *Yick Wo* [*v. Hopkins,* 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886) ]." *Arlington Heights,* 50 L.Ed.2d at 465. Despite the fact that this

---

**33.** For example, in one case aliens turned over to the Federal Drug Enforcement Administration might be excluded from the analysis, and in another they might be treated as detained. *See* 53 Tr. 2964–65.

**34.** Despite the government's continuing objection to characterization of data compilation as "favoring the Government," *e.g.,* 53 Tr. 2929, 3022, plaintiffs' representations to this effect obviously were correct. For example, if any non-Haitian's status was doubtful, but plaintiffs counted them as "detained," as a matter of simple mathematics it skewed the results in favor of the government; likewise if a Haitian's status was doubtful, but he was counted as paroled. One dramatic example of this procedure was when Dr. Gitlow added in as detained all non-Haitians who withdrew or were paroled to DEA or the U.S. Marshal. Compare Px. 191, table 4 *with* table 5. The effect of including these questionable cases was a drop from 49.2 to 20.35 standard deviations.

**35.** Standard deviation is an expression that measures an exponential deviation. Therefore, the difference between 2 and 3 standard deviations, let alone between 2 and 20, is much more significant than it would seem to an uninformed reader. Dr. Gitlow explained at trial:

> I would just like to demonstrate if there are more than three standard deviations above the mean, what the likelihood is and then I will calculate it at four, and that will explain it better than I can explain it.
> The chances of being greater than the three standard deviations are about one in a thousand. The chances of being the four standard deviations above the mean is about three in a hundred thousand. So, the one in a thousand versus three in a hundred thousand and when I go out to five, [sic] it is not much different between five and ten standard deviations. It is just all remote.

53 Tr. 2988.

alone establishes a prima facie showing of discriminatory intent, *see id.* (impact alone will suffice to prove prima facie case when pattern that emerges is stark), plaintiffs also introduced considerable evidence of other *Arlington Heights* factors.

### 2. *"Other Evidence"*

In addition to the statistical evidence plaintiffs introduced a plethora of "other evidence" of discriminatory intent, as permitted under *Arlington Heights,* 429 U.S. at 266, 97 S.Ct. at 564, 50 L.Ed.2d at 465–66. The district court's opinion described nine categories of admissible evidence relevant to discriminatory purpose, *Louis III* at 999–1000, but of these the court evaluated only two: historical background and departure from the normal procedures. The court found no substance to plaintiffs' contentions as to either of these categories. Plaintiffs cite this as error, urging that we hold the findings clearly erroneous, and recognize the other evidence under *Arlington Heights.*

Plaintiffs point to record evidence under three particular *Arlington Heights* factors: historical background, procedural and substantive departures, and administrative history. Although it is not readily discernible from a reading of *Arlington Heights* and the cases cited therein what evidence is pertinent to each factor, the evidence generally is valuable if it establishes an ongoing *pattern* of discrimination against the plaintiff class. 429 U.S. at 266, 97 S.Ct. at 564, 50 L.Ed.2d at 465. We hold the district court erroneously disregarded evidence of these factors.

Under the "historical background" factor, plaintiffs introduced evidence of numerous lawsuits initiated in the past to challenge disparate treatment of Haitian immigrants. *See Sannon v. United States,* 427 F.Supp. 1270 (S.D.Fla.1977) (political asylum claims in exclusion as opposed to deportation hearing); *vacated and remanded without opinion,* 566 F.2d 104 (5th Cir.), *vacated as moot,* 631 F.2d 1247 (5th Cir.1978) (INS' newly promulgated regulations offer same relief as that ordered by district judge); *National Council of Churches v. Egan,* No. 79–2959–CIV–WMH (S.D.Fla. Aug. 29, 1979) (Haitians work authorizations); *Haitian Refugee Center v. Smith, supra* (asylum claims of deportable aliens); *Louis v. Meissner,* 530 F.Supp. 924 (S.D.Fla.1981) (*Louis I*) (access to counsel, fair hearings, erroneous deportation).

Further, the testimony of numerous witnesses, including well-regarded members of the immigration bar and former high-ranking INS and Department of Justice officials, attested to persistent targeting and mistreatment of Haitian immigrants. *See* Px 109A (memorandum from David Yeres, Deputy Associate Attorney General to David Crosland, General Counsel, INS) (8 May 1979) ("we should strive to end the double standard that now seems to prevail between the handling of these Haitian [work authorization] claims and those made by others"); testimony of Charles Gordon (former General Counsel, INS, and recognized immigration expert) 38 Tr. 140, 157–58 (mass hearings); testimony of Monsignor Walsh (Administrator, Catholic Relief Agency and refugee expert) 38 Tr. 260–64 (discriminatory policy re: asylum claims of Haitians); Testimony of Sam Bernsen (former General Counsel, INS) 38 Tr. 216 (special detention and release policy toward Haitians prior to 1977); testimony of Ira Gollobin (immigration lawyer; counsel to National Council of Churches) 40 Tr. 646 et seq. (history of NCC struggle with government to ensure fair treatment of Haitians); testimony of Maurice Ferre (Mayor of the City of Miami) 41 Tr. 787, 789, 795–96 (discussions with Administration officials over course of time concerning disparate treatment of Haitians and Cubans; resolution of Miami City Council urging end to disparate treatment); testimony of Larry Mahoney (Public Affairs Officer, U.S. Department of State, Cuban-Haitian Task Force, July 1980 to May 1981) 43 Tr. 1140–43, 1148–50, 1168 (disparate treatment of Cubans and Haitians in camps; telephones for Cubans, Cu-

bans had recreation facilities, left camp for theatre, parents remained with minor children—not true of Haitians); testimony of Jacqueline Rowe (Equal Opportunity Officer for Community Action Agency of Metro-Dade County) 44 Tr. 1355–72, 1385 et seq. (differing arrival procedures for Cubans and Haitians).[36] All told, this unre-

butted and unexplained testimony shows an historical pattern of discrimination under *Arlington Heights.*

▮ The district court's discussion of this factor displays a misapprehension as to its purpose.[37] The court rejected the evidence of prior cases stating "[p]laintiffs be-

---

**36.** One portion of Ms. Rowe's testimony is telling of the treatment to which Haitians historically were subjected. These events occurred in early autumn 1980:

"As I mentioned, there was a young man on that particular day whose story seemed to indicate that he needed to fill out a form for political asylum. And because that could not be done by the INS officer at the Miramar site, I accompanied him to the INS site on Southwest First Street.

. . . .

"We went inside the building from the Southwest First Street entrance. There was a sign that said, Haitians to the rear, and I did not really quite understand.

"I took the elevator upstairs. There was no rear—

Q. Was that in English or in Creole, the sign?

A. "It was in English. I went up to the second floor of the building with the young man. I was told what that meant was that I had to go out of the front of the building and walk around to the back of the building and stand outside in line.

"Now, first I was concerned about it because right where I was there were INS officers and there were Cubans and they had some questions and they were given a number and I took a number and I went up to the desk and I said—I told them what my story was, and they said you have to go outside of the building. You stand in line outside the building and somebody will help, come out there to help you.

"I did go back outside. . . .

"[T]here were a group of 150, maybe 200 Haitian refugees who were standing in line outside in the sun. It was in the middle of the summer and it was hot and they stood. They just stood.

"And I stood, too, for a while with the young man, but I really did not have much time. There was no INS officer, no staff out there.

"So, after standing there for a while, I went back inside the building to tell them that if I was supposed to be standing outside waiting for somebody in the back of the building [sic].

"There was, in the building, there was a stairway that led to the back door of the building, and we were told to stand on the

stairway and wait. I went back inside to tell them there is nobody out there and when I went back inside, I opened the door to go in and two INS staff people—oh, I was not the only one there. There was a group of people there, and they were pushing us all down, you know, that kind of treatment. I mean, really, that's what happened to us.

"By that time I said to the INS officer, 'What are you doing? I think this is archaic.'

"And he said, 'Oh, I'm sorry,' as if to say, 'Oh, well, you speak English.'

"He said, 'I'm sorry, what are you here for?'

"And I explained to him why I was there. And he said:

" 'Let me take the name of the young man who you are with and I will come out and I will call you.'

"So we went back to the first floor out around the back, stood again outside with these other couple of hundred people out there, some with babies, sitting on the stoop.

"There were no bushes, it was sun, and mothers, you know, with babies, and children and there were just people all over and nobody came out.

"And I eventually just left and reported back to the INS Deputy Director, who at that time, I believe, was Mr. Galudge (phonetic)." 44 Tr. 1384–87.

**37.** The district court's misunderstanding of this factor had an impact upon the trial itself. Ira Gollobin, counsel to the National Council of Churches, was testifying to that organization's struggle over a number of years to obtain equal treatment for the Haitians. He testified concerning a period of ten years prior to this litigation, concentrating on the period prior to the Settlement agreement entered into between the Government and the Council in 1977. This string of ten years during which Mr. Gollobin could testify to persistent mistreatment was obviously relevant under the historical background factor of *Arlington Heights.* Nevertheless, the district judge cut short the testimony concerning events in 1973 saying: "Let's not make it too historical. We are talking about nine years ago. Let's not get into too much detail and move forward." 40 Tr. 646. This is the sort of evidence ignored by the district court in its opinion, yet the citation of authority

lieve, and would like this Court to conclude, that the practices challenged herein are a mere continuation of the prior INS policy against excludable instead of deportable Haitians." *Louis III* at 1001. Rather, the judge found the practices were a result of the "increased flow of Haitians to South Florida during the years 1977 to 1980 and by the massive influx of Cubans during the boatlift in 1980."[38] The issue, however, is not whether this is a continuation of a former policy, but whether plaintiffs are able to introduce sufficient evidence of past discrimination against the class to support an inference that the current disparate impact too is a result of discriminatory intent. *See Arlington Heights,* 429 U.S. at 266, 97 S.Ct. at 564, 50 L.Ed.2d at 465 (historical evidence relevant particularly if it "reveals series of official actions taken for invidious purpose"). There is certainly sufficient unrebutted testimony to support such an inference in this case. In misapprehending the purpose of historical background, the district court failed properly to credit this evidence.

█ Departure from the normal procedural sequence may refer to the administrative sequence for formulating policy, or it may refer to the procedural sequence of exclusion adjudication to which plaintiff class members were subject.[39] In this case the latter surely permits an inference of discriminatory intent. Plaintiffs introduced evidence to describe numerous departures from the normal exclusion procedure described heretofore. Plaintiffs were served with I-122's[40] before they could present asylum claims to the District Director, *infra,* at 1507-1508, were subject to mass exclusion hearings behind closed doors, were found excludable in hearings in which the translators failed to translate Creole properly, *see supra* at 5, and in some instances were deported in a manner INS itself admits was faulty. *See generally Louis I,* 530 F.Supp. 924, *passim.* This evidence also was largely unrebutted and at least in one instance INS conceded its error. *Id.*

The district court, however, disregarded this evidence. It stated "[p]laintiffs were subjected to these *new* procedures but they were not alone." *Louis III* at 1001-02. This conclusion is clearly erroneous. Outside of "mere protestation" INS introduced no evidence that any group other than the Haitians was subjected to these questionable practices. Not surprisingly, the government points to no such rebuttal evidence in its brief.

by the Supreme Court in *Arlington Heights* indicates a ten-year period may well be relevant. *See Arlington Heights,* 429 U.S. at 266, 97 S.Ct. at 564, 50 L.Ed.2d at 465, *citing Griffin v. School Board,* 377 U.S. 218, 84 S.Ct. 1226, 12 L.Ed.2d 256 (1964) (detailing racial discrimination over ten-year period).

**38.** The first reason, the "increased flow" is, of course, unsupported by the evidence. As we note throughout the opinion, the Haitian flow was not more than 2% of the illegal immigration flow, yet the government failed altogether to introduce evidence of similar procedures used on non-Haitian immigrants. The second reason, "the massive influx of Cubans," is irrelevant to this litigation, though we perceive one underlying message of the entire litigation is that the Haitians were treated as they were as a result of the sudden Cuban migration during the Mariel boatlift.

**39.** The *Arlington Heights* opinion does not elucidate upon which of these properly are considered, stating only "[d]epartures from the normal procedural sequence also might afford evidence that improper purposes are playing a role." 429 U.S. at 268, 97 S.Ct. at 565, 50 L.Ed.2d at 466. We believe evidence of either departure from standard adjudication procedures *or* administrative decisionmaking might permit an inference of discrimination, but it is the former that is more significant in this case. To the extent that immigration was a problem of national dimensions, it was not unusual for the Executive Branch deal with it in a unique way, and this alone would not suggest discriminatory intent toward the Haitians.

**40.** An I-122 is the notice served upon an alien requiring him to appear for an exclusion hearing. Once the alien is served with an I-122 there may be no further "extra-judicial" contact between INS and the alien, thereby foreclosing an application for asylum before the district director.

The district court also ignored evidence under the factor plaintiffs refer to as "procedural sequence" of the administrative process formulating the Haitian policy. This evidence is relevant, although it more properly is considered under the *Arlington Heights* factor "administrative history," (both before and after adoption of the new policy). We find no fault with a Presidential Task Force to deal with problems of national import such as immigration; we are concerned with the pages of documents acquired by plaintiffs in discovery that indicate a special discriminatory "Haitian Program."

The import of these documents is dependent upon reading them in context. First, it is helpful to note the INS code number for Haitians. Some documents do not specifically mention Haitians but merely assign the document by code to the Haitian file. The code number is CO 243.85. It appears on a variety of documents alarming as to both their number and content. *See e.g.,* Px 80 "Report as to status of space for detention and prior surveys" (David Crosland, General Counsel INS to David Hiller, Special Assistant to the Attorney General, 19 May 1981); Px 86 "Contingency Plan for the Detention of Cubans/Haitians in Florida and Other Locations" (Hugh J. Brian, Acting Assoc. Comm'r., Enforcement to Doris Meissner, Deputy Commissioner, 27 April 1981) (specifically referring to eliminating the right to apply for asylum to the District Director); Px 92 "Cuban/Haitian Policy" (Crosland to Hiller, 2 April 1981) (detention of Haitians and Cubans); Px 94 "Haitian Policy" (Crosland to Kenneth Starr, Counselor to the Attorney General, 20 March 1981) (deprive right of asylum before District Director; detention for Haitians despite fact appeal process could extend over one year).

Second, it is helpful to bear in mind the "protestations" of INS officials, discussed more fully, *infra,* that the policy was intended to be applied "across the boards," but had its greatest impact on Haitians because no one else was "similarly situated." Plaintiffs' documents belie this. *See, e.g.,* Px 71a "Memorandum on President's Task Force" (Hiller to Task Force, 19 May 1981) (annual illegal inflow estimated at 500,000; Mexicans account for about 80% of total); Px 71b Issue Paper, "What Policy should the United States adopt with regard to foreign persons who enter South Florida without visas?" (same; Haitians account for "probably less than two percent"); Px 93 "Detention Policy . . . Cubans . . . and Haitians" (Nelson, Phillip Hawkes, Director, Office of Refugee Resettlement, INS to Guiliani, 15 December 1981) (drastic drop in Haitians compared to 1980).

Third, the government consistently argued against judicial interference with its uniform policy adopted by the President in the summer of 1981. Yet, plaintiffs' documents show the efforts and practices here at issue were instigated some time before that. The initial administrative discussions also seem to indicate a target identified previously to the summer of 1981. *See e.g.,* Px 77e "Processing of Haitian Cases in Miami District" (Charles Sava, Associate Comm'r, Enforcement to Mario Noto, Deputy Comm'r, 14 July 1978) (most effective deterrent to immigration is expulsion of Haitians in the country; Enforcement to take the lead in getting hearings moving swiftly); Px 77d "Haitian Program" (Richard Gullage, Acting District Director, Miami to All Employes, 23 August 1978) (Haitian cases cannot be delayed in any way; staff to take whatever action necessary to keep cases moving); Px 77b "Haitian Undocumented Aliens" (Note to Castillo, Commissioner, INS 20 July 1978) ("If, in accordance with policies to be established, the Haitians may be amenable to detention, . . .").

Finally, there are the documents that indicate the understanding of at least some Administration officials that the new policy was not to be applied universally. The best example of this is Plaintiffs' Exhibit # 1, a Telex from the Regional Commissioner,

Dallas to INS District Director, New Orleans, INS Associate Commissioner for Enforcement, and INS Associate Commissioner for Detention and Deportation, on September 2, 1981:

PRIORITY

BE ADVISED CURRENT SERVICE POLICY AND SOUTHERN REGION POLICY RE (HAITIANS) APPLICANTS FOR ADMISSION/ASYLUM REQUIRE THEY BE DETAINED PER I & NA 235(B) AND 8 CFR 235.3(B).

(parenthetical in original).

■ All told plaintiffs mustered an impressive array of witnesses and an equally impressive number of documents to demonstrate circumstantially, and to an extent, directly, intentional government discrimination against Haitians. This evidence, in addition to the statistical evidence, was unrebutted but for the government's testimonial evidence, which can at best be termed "mere protestation." Without evidence of similar mistreatment of other immigrant groups, the district court had no factual basis for finding these practices were directed at others, or that they would be directed to others who were similarly situated. Based on the lack of evidence, the district court's findings are clearly erroneous.

## C. The Government's Case

### 1. Methodological Challenge—The Statistical Evidence

By way of rebuttal the government challenged the methodology employed by plaintiffs to prove impact. The essence of the government's claim was, and is, that binomial analysis is inappropriate to prove impact because parole is not a random process. The district court accepted this argument, disregarding the impact demonstrated by the statistical evidence, stating "parole is not a random process and the probability of parole is not the same for every person," *Louis III* at 983. For an abundance of reasons we uphold the methodological validity of plaintiffs' statistical analysis.

The Supreme Court has recognized the validity and value of statistical analysis in cases of this sort. "[O]ur cases make it unmistakably clear that '[s]tatistical analyses have served and will continue to serve an important role' in cases in which the existence of discrimination is a disputed issue." *Teamsters v. United States,* 431 U.S. 324, 338–39, 97 S.Ct. 1843, 1856, 52 L.Ed.2d 396, 417 (1977) (citation omitted). The government generally concurs but argues this case differs from the traditional discrimination case employing statistics such as a jury selection case, because in a jury case selection of a jury is a random process whereas parole from detention is not.

■ Despite the fact that the government fails to articulate cogently its objection to the use of binomial analysis in a non-random situation, we understand the theoretical difficulties. As we explained, *supra,* binomial analysis compares a result expected in a random world with what actually occurred and then presumes some unspecified force is at work if the actual result differs significantly from the expected result (measured by the standard deviation). In discrimination cases the inference is that intentional discrimination is this "unspecified force." The government contends such analysis is inappropriate to this case, however, because parole is not a random process. It argues the deviation between expected numbers of Haitians detained or paroled from what is actually occurring could be explained in any number of ways other than intentional discrimination. Specifically, the government argues parole depends on a number of finely-tuned factors or "qualifications," and the disparity in numbers of Haitians and non-Haitians incarcerated is accounted for on the grounds that the Haitians do not qualify under the parole standards. For seven different reasons, the government's argument fails to measure up under either the law or the facts of this case.

The first problem with the government's position is that Supreme Court has relied on

statistical evidence in situations not wholly random. Although the government offers jury selection as the epitome of randomness the fact is that the selection method at issue in *Castaneda v. Partida* was not a random one. The Supreme Court in *Castaneda* acknowledged that the "key-man" jury selection system at issue was "highly subjective." *Castaneda v. Partida,* 430 U.S. at 497, 97 S.Ct. at 1281, 51 L.Ed.2d at 512.[41] Nonetheless, the case was decided primarily on the basis of statistics analogous to the ones before us. *Id.,* at 495–97, 500, 97 S.Ct. at 1280–81, 1283, 51 L.Ed.2d at 511–12, 514. The Supreme Court likewise has accepted binomial analysis in employment discrimination cases where it is undisputed that a lack of qualified plaintiffs may explain statistical disparities as well as an inference of discrimination on the part of the employer. For example, in *Teamsters v. United States,* 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977), the Court relied on statistical evidence of disparities between minorities in the population-at-large and minorities employed as drivers as evidence of discrimination. *Id.* at 338–41, 97 S.Ct. at 1856–57, 52 L.Ed.2d at 417–19. Although qualifications were not generally at issue in *Teamsters,* petitioners did raise qualification arguments similar to those the government advanced here. *Id.* at 342 n. 23, 97 S.Ct. at 1858 n. 23, 52 L.Ed.2d 419 n. 23. In response the Court stated:

In any event, fine tuning of the statistics could not have obscured the glaring absence of minority line drivers. As the Court of Appeals remarked, the company's inability to rebut the inference of discrimination came not from a misuse of statistics but from "the inexorable zero."

*Id.* (citation omitted).

▰ This is not to say the Supreme Court has ignored the question of qualifica-

tions when using binomial analysis; quite the contrary is true. The Court has had occasion to note that "[w]hen special qualifications are required to fill particular jobs, comparisons to the general population ... may have little probative value." *Hazelwood School District v. United States,* 433 U.S. 299, 307, n. 13, 97 S.Ct. 2736, 2742, n. 13, 53 L.Ed.2d 768, 777 n. 13 (1977). Here, however, the government altogether ignored the body of jurisprudence concerning proof of, and analysis of, special qualifications while blindly asserting binomial analysis is never appropriate in a non-random situation. That is certainly not the case.

▰ Second, we emphasize that plaintiffs may prove a prima facie case without accounting for qualifications when the statistical impact is sufficiently glaring. This we established in *Fisher v. Procter & Gamble Manufacturing Co.,* 613 F.2d 527 (5th Cir.1980), *cert. denied,* 449 U.S. 1115, 101 S.Ct. 929, 66 L.Ed.2d 845 (1981):

Mindful of [the admonition in] *Hazelwood* [concerning proof of special qualification], we nevertheless find the plaintiff's statistics adequate to establish a prima facie case. First, a prima facie case may be shown without evidence of qualifications where the inference of discrimination is supported by a compelling level of racial underrepresentation in a sizeable work force. In *Hayes International Corp.,* [456 F.2d 112 (5th Cir.1972) ] we noted that when substantial underrepresentation is shown as compared with general population figures, the burden of proving lack of qualifications is on the Company.

*Id.* at 544 (citation omitted). And, there is good reason for this. Requiring too much

---

41. Under Texas' "key-man" grand jury system the jury commissioners select 15–20 people to comprise the list from which the grand jury is chosen. 430 U.S. at 485, 97 S.Ct. at 1275, 51 L.Ed.2d at 504. Those chosen then appear in court to have their "statutory qualifications" tested. *Id.* at 485, 97 S.Ct. at 1275, 51 L.Ed.2d at 504–05. Significant to the decision in *Castaneda* is the fact that absent testimony from the commissioners as to the qualifications they employ in choosing their list it is impossible to know the basis on which that list is chosen. *Id.* at 499, 97 S.Ct. at 1282, 51 L.Ed.2d at 513. As we hold, *infra,* a similar situation is present here. Although qualifications for parole may exist we cannot discern them absent uniform testimony from those individuals responsible for parole policy or implementation explaining what relevant qualifications are examined.

proof initially from a plaintiff may defeat a valid claim of discrimination before its validity is discerned. Allowing proof of the prima facie case with glaring statistics, however, does not unduly burden a defendant. The defendant, in rebuttal, can prove the unaccounted-for qualifications, thereby undermining plaintiff's case. *Cf. Vuyanich v. Republic National Bank of Dallas,* 505 F.Supp. 224, 356 n. 169 (N.D.Tex.1980). In this case plaintiffs not only introduced "compelling" statistical evidence, they introduced substantial "other evidence" under *Arlington Heights* as well. We must accept plaintiffs' prima facie case as established; it behooved the government to rebut the case, if it were able, by introducing evidence of those unaccounted-for parole qualifications.

Third, it is nonsensical to require plaintiffs to establish qualifications of the plaintiff class when the relevant qualifications were vague, uncertain or unknown. The district court could not state the detention/parole policy with any certainty. The district court found that no guidelines for parole were ever promulgated. The district court stated that because of the lack of guidelines government witnesses described one policy while their subordinates enforced another. *See Louis III* at 981 n. 24.

■ Yet, despite its inability to locate a written parole policy, and its inability to specify exactly what the policy was, either of which would indicate those qualifications important to a parole determination, the court below swept away plaintiffs' statistics on the basis that they did not reflect the relevant qualifications. The district court stated:

> Factors that may be considered include the age and health of the alien as well as the reason he does not appear entitled to enter this country. Other factors include

being accompanied by a minor and pendency of an I–130 application. These factors, with the exception of documentation, were not separately analyzed by Plaintiffs' expert. With regard to his analysis of the significance of possessing documents it was far too simplistic because it did not distinguish between the types of documents possessed and the facial validity thereof.

*Louis III* at 982. This determination is clearly erroneous and wholly unsupported by the evidence. *Pullman Standard v. Swint,* 456 U.S. 273, 102 S.Ct. 1781, 72 L.Ed.2d 66 (1982). It also conflicts with the district court's own determinations concerning the APA claims, determinations which for the most part we uphold. Although factors similar to those mentioned by the district court were suggested piecemeal during the course of the trial, there is no evidence to suggest they formed a coherent policy.[42] Rejecting a well-supported claim of discrimination on the basis of vaguely-asserted and ill-defined qualifications represents a clear error of law and fact.

■ Fourth, even had those factors relied upon by the district judge uniformly and consistently been offered by government witnesses they would be insufficient proof of additional parole qualifications. The law is clear that "mere protestation" is insufficient to rebut a plaintiff's prima facie case. *E.g., Castaneda v. Partida,* 430 U.S. at 499 n. 19, 97 S.Ct. at 1282 n. 19, 51 L.Ed.2d at 513 n. 19; *Alexander v. Louisiana,* 405 U.S. 625, 633, 92 S.Ct. 1221, 1226–27, 31 L.Ed.2d 536, 543 (1972). Yet, the record contains nothing more than the self-serving testimony of high government officials that the policy was not intended to be discriminatory, *see, e.g.,* Nelson testimony, 47 Tr. 1972–73; Guiliani testimony, 49 Tr. 2343, as well as a variety of vague, contradictory statements concerning parole fac-

---

42. In December of 1981 INS did publish "Detention Policy Guidelines in Exclusion Cases." *See* Px. 71c. This post hoc rationalization of the government's policy is insufficient to prove a policy implemented in fact in the early spring of 1981. We also note the district court's enunciation of relevant factors differs significantly from these guidelines, which contain no mention of, for example, "the reason ... [the alien] does not appear entitled to enter...."

tors. *See supra,* at 1470–1473 (disagreement among government officials as to policy).[43] Beyond this, the record is clear that whatever the officials responsible for policy formulation intended, those intentions never were conveyed to immigration officials responsible for implementation of the policy.

Fifth, the government failed to demonstrate that parole decisions were made in a non-discriminatory manner. Although the evidence at trial was clear that parole decisions were made, if at all, at a rather low level of authority in the immigration corps,[44] the government declined to offer as a witness any individual who could explain or demonstrate exactly which factors were considered in granting parole. *See Castaneda v. Partida,* 430 U.S. at 497–

99, 97 S.Ct. at 1281–82, 51 L.Ed.2d at 512–13 (discussing value of jury commissioner testimony to rebut statistical evidence of discrimination). In this regard the opinion of the Second Circuit in *Bertrand v. Sava,* 684 F.2d 204 (2d Cir., 1982) is instructive. In *Sava* the Court of Appeals admonished the district judge for substituting his judgment for the discretion of the District Director, *who took the stand to explain in specific cases why members of the plaintiff class were not paroled.*[45] The record before us is devoid of any such evidence.

Sixth, shifting the burden to the government to establish special qualifications especially is appropriate when the data necessary to evaluate alleged qualifications is uniquely in the government's possession and when, as here, plaintiffs have

**43.** The government cites *United States v. Perez-Hernandez,* 672 F.2d 1380 (11th Cir.1982), for the proposition that testimony alone is sufficient to rebut statistical evidence of discrimination. In *Perez-Hernandez* the criminal defendant challenging selection of the grand jury foreman established through statistical evidence a prima facie case of discrimination. In rebuttal eight district judges testified as to the criteria used in choosing a foreman. "Each judge testified that he acted independently of the other judges in choosing a grand jury foreman, although each employed similar guidelines in making a selection." *Id.* at 1387. The record indicated no evidence the judges ignored the stated criteria or chose non-minorities over equally qualified minority jury members. *Id.* at 1388.

*Perez-Hernandez* is distinguishable from this case. First, there is no basis for the "qualifications" evidence found in the testimony of the government witnesses in this case. The district judge himself stated no one witness offered the same criteria. Further, those criteria never were communicated to the INS officers actually granting or denying parole. By contrast, in *Perez-Hernandez* those actually charged with discrimination testified. Second, there was no evidence in *Perez-Hernandez* that refuted the rebuttal testimony. The record before us is replete with testimony contradicting the good-faith affirmations and self-serving criteria of government witnesses. Testimony alone is insufficient when there is little reason to credit it, and when the record gives rise to serious question as to the validity of that testimony. In that situation, the testimony must be supported

by proof. In this case the government produced no evidence that the policy criteria were communicated to INS officers, nor did it provide testimony as to the basis of a parole decision in any given case.

**44.** The alternative formulation suggested by the district court was that the new policy as announced withdrew from the district directors all discretion to parole undocumented Haitians. The district court cautioned that any regulations promulgated in response to its final order that had this effect would be violative of due process, *Louis III* at 1001–02 n. 52. As we have no due process claim before us we venture no opinion as to the district court's analysis.

**45.** We are mindful of the language in *Teamsters v. United States,* 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977), to the effect that proof of non-discriminatory individual actions need not bind a court where the concern is proving a pattern of discrimination. *Id.* at 343 n. 24, 97 S.Ct. at 1858 n. 24, 52 L.Ed.2d at 420 n. 24. Here, however, the government challenges plaintiffs' failure to present a statistical case that takes special qualifications into account. In this instance proof of what those qualifications were, and that they were applied, would have been beneficial, *see Castaneda,* 430 U.S. at 499, 97 S.Ct. at 1282, 51 L.Ed.2d at 513 (jury commissioner testimony), particularly when the evidence offered showed no qualifications were promulgated or communicated to immigration officials allegedly applying those qualifications.

requested and not received the necessary data. Almost all the data analyzed by plaintiffs' expert came from the government in response to discovery requests. We have scrutinized that data; for the most part it is lacking entirely in information sufficient to permit qualification analysis. As a general rule we will not penalize one party for failing to explain or present data uniquely in the possession of the other. *See Reed v. Rhodes,* 607 F.2d 714, 735 (6th Cir. 1979) (party may not complain of district judge's misuse of data they provided, particularly when opportunity existed to explain correct figures), *cert. denied,* 445 U.S. 935, 100 S.Ct. 1329, 63 L.Ed.2d 770 (1980).[46] It was error to hold plaintiffs responsible for any failings of the data.

Seventh, despite the fact that the alleged qualifications never were cogently described by the government, and that the government never produced data susceptible to qualification analysis plaintiffs anticipated and adequately met the government's statistical challenge. Plaintiffs offered a variety of statistical and testimonial evidence to demonstrate that qualifications were irrelevant. Dr. Gitlow analyzed the data from a similar case in New York, *Bertrand v. Sava,* 684 F.2d 204 (2d Cir.1982). The statistical data from *Sava* certainly suggested that documentation, asylum and family ties had little or nothing to do with the release of some 107 non-Haitians arriving after May 20, 1981.[47] 45 Tr. 1631 et seq. Next, Dr. Gitlow performed multivariate analysis on the District VI data and there again demonstrated document status had little to do with detention or parole.[48] Finally, Robert Boyer, an immigration attorney involved with Nicaraguan applicants for asylum and

**46.** The district court stated "[t]he decision to grant a deferred inspection takes into account many factors not contained in the data analyzed by Plaintiffs' statistician." *Louis III* at 983. Having so stated the facts, however, the district court failed to give them appropriate credence. Not only was information necessary to do qualification analysis not in the data Dr. Gitlow analyzed, but all of the necessary data was in the government's possession. It certainly is not the fault of plaintiffs that the data they analyzed was insufficient; plaintiffs vigorously fought to obtain all relevant data the government possessed. Despite untold discovery requests and motions, the government produced only that data analyzed. In fact, a fair portion of the data was produced while trial was in progress, on occasion the day the data was to be discussed in court. Further, the very fact that immigration records are not readily susceptible to qualification analysis casts doubt on the relevance of the suggested qualifications.

It would be inaccurate to represent that the government's records were entirely lacking in information concerning family ties, asylum claims, etc. The truth is that the quality of the data evaluated differed drastically, presumably because of files lost, or differences in those completing the files. It is equally apparent, however, that when that data was available it did not support the government's position. A quick review of the data indicates the lack of correlation between the asserted qualifications and parole. We stress, however, that we are not deciding the case on an independent view of the data. Because the data is so uneven in quality we are excusing plaintiffs from any burden to have attempted qualification analysis.

**47.** The government challenges the use of the *Sava* data, but its grounds are inapposite. The district judge in *Sava* was reversed for substituting his judgment for that of the district director. What distinguishes *Sava* is there the district director testified, proved his involvement in parole decisions, enunciated what factors he considered, and in what manner. The Second Circuit held that the district court's second-guessing of the district director on this issue was inappropriate. Here, we have no testimony from any party admitting involvement in the parole decisions. The district director in Miami specifically testified that he had delegated his parole authority, 48 Tr. 2156, Howerton Dep. at 12, and could not say specifically what the parole criteria were. 48 Tr. 2159. The delegees did not testify.

**48.** The district court believed Dr. Gitlow's document analysis was "far too simplistic" in that it did not distinguish between type of document and whether it was a case of fraudulent documents or non-existent documents. Yet, the data coding sheets agreed upon by the parties call for a (U) for undocumented, or a (D) for documented. Some entries read D–PP (presumably documented, passport), and then contain in comments "no visa." Further, the role of documents was one more factor about which high-ranking government officials disagreed. *See supra* n. 9.

admission, identified numerous occasions where Nicaraguans arrived with fraudulent documents, or no documents, no claimed family ties, no illness or other disability, yet were released while their asylum claims were pending. 39 Tr. 426, *passim.* As Boyer's testimony was unrebutted, it is evident plaintiffs proceeded much further with a qualification argument than the government would have us believe.[49]

It strikes us plaintiffs managed to disprove a case the government has failed to make in any way other than by mere protestation or arguments of counsel. The government certainly failed to establish the invalidity of plaintiffs' methodology. For the seven reasons enumerated above we approve the proof of impact established by plaintiffs.

### 2. *Minimizing Impact—Rebuttal*

■ The government advanced three arguments to explain the disparate impact of its new policy upon the Haitians. Finding merit in these arguments, without according special weight to any of them, the district court found that the apparent disparate impact on the Haitians could be explained "on grounds other than race and/or national origin." *Louis III* at 1000. This was error. Not only are the arguments largely irrelevant, but crediting them rewards the government for its misconduct.

The culprit first identified by the government to exonerate it from responsibility for the disparate impact of the new policy is the district court for the Southern District of Florida. In *Louis I* that court entered an injunction prohibiting the government from holding exclusion hearings for, or from deporting, unrepresented class members. Presumably, because it was enjoined from

conducting exclusion hearings for class members, the government was required to hold the Haitians in detention. According to the government, the injunction, and not discriminatory intent, was responsible for the incarceration of a disproportionate number of Haitian immigrants.

As stated *supra,* the injunction was entered in federal district court because the district judge determined plaintiffs had a likelihood of showing on the merits that defendant INS' proceedings in exclusion were "violative of the law." *Louis I,* 530 F.Supp. 924, 929 (S.D.Fla.1981). In addition to numerous instances of misconduct cited by the district judge, the court's findings as to irreparable harm are worthy of quotation:

> Indeed, in an earlier point in these proceedings, INS deported eleven refugees to Haiti pursuant to procedures that the government later agreed were faulty. Unfortunately, the government's concession came too late to assist these eleven individuals. It is to prevent a similar problem that this Court must enjoin the deportation of unrepresented class members.

*Id.* at 928.

We perceive two enormous difficulties, one factual and one equitable, with the government's claim that the injunction, and not the government, was responsible for the number of Haitians in detention. Factually, there was no reason for the government to continue detaining class members simply because it could not proceed to exclude them. There was always the option of parole, the discriminatory award of which forms the gravamen of this action. The government may not have wished to parole the Haitians, preferring detention as a mat-

---

**49.** On cross-examination the government vigorously questioned Boyer concerning the underlying validity of Nicaraguan claims for admission. This was irrelevant. The individuals about whom Boyer testified were all paroled or granted deferred inspection despite document

problems and before the underlying merits of their claims were investigated. This suit is not addressed to whether individuals eventually succeeded with an asylum claim or were deported, but with interim events.

ter of policy,[50] but it certainly was not enjoined from exercising its parole powers. The injunction in *Louis I* does not explain adequately the disparate impact.

Second, as an equitable matter we are disturbed the government should ask us to excuse a prima facie showing of misconduct on the basis of an injunction entered in response to other governmental error or misconduct. The injunction was entered in *Louis I* in the face of rather egregious government misconduct. Acceptance below of the injunction in *Louis I* to explain the discriminatory detention of Haitians has the appearance, if not the effect, of condoning the government's earlier misconduct. That is particularly true as the injunction entered in *Louis I* did not require detention, nor did it foreclose parole. Accordingly, it was error for the district court to accept this explanation in rebuttal.

The second culprit allegedly responsible for the appearance of disparate impact is the Immigration and Naturalization Service, which instituted a program of bringing the Haitians before an immigration judge before allowing them to depart voluntarily. The district court found that although individuals from other nations were permitted to withdraw their applications for admission and depart immediately this "voluntary departure" was a slower process for Haitians because of the INS rule. Ostensibly this extra precaution took so much time that it partly explains the enormous

disparity between Haitians and non-Haitians detained.

Voluntary withdrawal is a process whereby an alien in exclusion proceedings may decide to terminate those proceedings, "voluntarily withdraw" from our borders, and return from whence he came. Voluntary withdrawal of the Haitians became an issue when the HRC challenged voluntary withdrawals alleging coercion and misrepresentation on the part of INS officials. The Special Master appointed to investigate these allegations found that although a certain number of Haitians withdrawing were doing so voluntarily, this was not universally the case. Master's Report and Recommendations at 12, 15, 16, 18. The Special Master found some Haitians were withdrawing due to the conditions of their detention, some because of despair at continued incarceration and separation from families, and some because of a lack of knowledge of their rights. *Id.* at 12, 15, 17–18.[51]

Voluntary withdrawal, and the INS program inserting an immigration judge into the process, is unrelated to the disparate impact of the new policy. At most this additional process delays departure of withdrawing Haitians a day or so. It might even prevent the departure of those whose "voluntary" withdrawal was in fact coerced. In no way, however, does the special procedure prevent INS from paroling Haitians into the community.[52]

Finally, there is the "asylum" argument. The district court explained:

**50.** The government's preference was apparent from the trial testimony. When asked at what point the government planned releasing the Haitians, Commissioner Nelson responded that would be as soon as the injunction was lifted and they could be excluded, then deported. 47 Tr. 1983.

**51.** The Special Master described the Haitians he interviewed in these general terms:
Often confused, bored and imprisoned, denied freedom of choice, freedom to roam without being counted, these Haitian refugees' hearts and spirits were broken.
Without exception, the Haitians interviewed could not fathom what they had done to cause their incarceration. Those factors, and others which surfaced during the inter-

views, made it clear to the Master that there were elements of emotional trauma, fear, "pressure against the power of resistance," and subtle, indirect, as well as (in a few cases) direct, efforts to overpower the weak-willed, disheartened and disillusioned. See and compare, *Stein v. New York,* 346 U.S. 156, 185, 73 S.Ct. 1077, 1093, 97 L.Ed. 1522 (1953).
Master's Report and Recommendations at 9.

**52.** In this context the district court stated:
. . . there is some evidence in the record that aliens of other nationalities, particularly Mexicans, when faced with the choice of staying in detention or voluntarily departing the country, choose the latter alternative.
On the other hand, Haitians cannot voluntarily withdraw their applications for admis-

Another reason [for the apparent disparate impact] is the State Department's position, be it right or wrong, that a prima facie case of asylum is not established solely by virtue of the fact that a Haitian national has left his homeland. Without the opportunity to present further evidence that there is a well-founded fear of persecution upon return to Haiti, the individual Plaintiffs herein cannot establish a prima facie case for asylum thereby entitling them to release on parole.

*Louis III* at 1000.

■ This explanation also fails. First, no government witness established that citizenship in any relevant comparison group constitutes a prima facie case for asylum. Second, evidence differed on the effect of a prima facie case for asylum on detention and parole. *See* n. 9 *supra*. Finally, as we explore *infra*, the government took discriminatory steps to cut off the Haitians from one avenue by which they could claim asylum. If asylum is so important to release that a prima facie case for asylum makes the difference between freedom and incarceration the government should have made asylum procedures readily available to the Haitians.[53]

### D. *The Final Analysis*

We are left, then, with a strong case of discrimination essentially unrebutted by the government. Plaintiffs introduced statistical information based on data provided by the government, data which showed that class members suffered a grossly disparate impact of the new policy. Plaintiffs also introduced a mass of testimony and documents relevant to various other *Arlington Heights* factors. In response the government relied on five witnesses.[54] One testified only to the access issue in remote detention facilities, *see infra;* another only to efforts of the Bureau of Prisons to locate detention space. The three remaining witnesses were Guiliani, Nelson and Howerton, whose testimony we discussed *supra.* All were admittedly removed from the actual process of parole, their testimony was inconsistent, and their self-serving affirmations of good faith fail to constitute rebuttal.

The facts bear review. The government introduced no evidence of what was actually occurring. No individual responsible for parole and detention decisions took the stand. The District Director testified he had delegated his authority to others, others who in turn testified in depositions to still further delegations. The evidence does not support any but the vaguest view of the new policy. Even if trial witnesses had established a uniform new policy, that new policy was never communicated to INS officials responsible for its implementation.

■ The government's case therefore consisted of nothing but "mere protesta-

---

53. We are aware that a "prima facie" case for asylum differs from a grant of asylum based on the evidence. But, a grant of asylum *a fortiori* is stronger grounds for release than a "prima facie" case, which might be rebutted in the final analysis. The inequity of the government's program that eliminated Haitian claims to the district director, therefore, compels us to reject the government's argument that being Haitian does not qualify one for "prima facie" asylum.

54. In addition to these 5 "main" witnesses, other individuals testified to the numerical computations underlying the government's "statistics."

---

sion without court approval and, therefore, release of Haitians who desire to voluntarily depart is significantly delayed.

It is not clear from the district judge's opinion what required "court approval." We assume he referred to the immigration judge procedure, and address this claim in the body of the opinion. It is also possible he was referring to the injunction entered in *Louis I,* which prohibited the deportation of *any* class member, whether for voluntary departure or otherwise. This alternative interpretation likewise is invalid. First, it suffers the same defects as the argument concerning the injunction from holding exclusion hearings. Second, the injunction in *Louis I* specifically was modified to allow the voluntary departure of some Haitians. *Louis v. Meissner,* No. 81–1260–CIV–ALH Order of Nov. 26, 1981) (Kehoe, J.).

tion" and "arguments of counsel." These do not constitute rebuttal of a prima facie case of discrimination, especially one as strong as that proven by plaintiffs. *See Burdine, supra,* 450 U.S. at 255 n. 8, 101 S.Ct. at 1094 n. 8, 67 L.Ed.2d at 216 n. 8; *Castaneda, supra,* 430 U.S. at 499 n. 19, 97 S.Ct. at 1282 n. 19, 51 L.Ed.2d at 513 n. 19; *Alexander v. Louisiana,* 405 U.S. 625, 632–33, 92 S.Ct. 1221, 1226–27, 31 L.Ed.2d 536, 543 (1972). In fact, the government's case as presented reminds us of equally applicable language from *Castaneda:*

> We emphasize, however, that we are not saying that the statistical disparities proved here could never be explained in another case; we are simply saying that the State did not do so in this case.

430 U.S. at 499, 97 S.Ct. at 1282, 51 L.Ed.2d at 513.

As the district court recognized, this is a classic case of unguided and unfettered discretion. *Louis III* at 981 n. 24. Cases are legion that discern the dangers of unguided discretion, preeminent among them the risk of selective and discriminatory enforcement. *E.g., Papachristou v. City of Jacksonville,* 405 U.S. 156, 170–71, 92 S.Ct. 839, 847–48, 31 L.Ed.2d 110, 120 (1972); *Yick Wo v. Hopkins,* 118 U.S. 356, 369–70, 373–74, 6 S.Ct. 1064, 1072–73, 30 L.Ed. 220 (1885); *Environmental Defense Fund, Inc. v. Ruckelshaus,* 439 F.2d 584, 598 (D.C.Cir.1971). "Where, as here, there are no standards governing the exercise of discretion . . . , the scheme permits and encourages an arbitrary and discriminatory enforcement of the law." *Papachristou,* 405 U.S. at 170–71, 92 S.Ct. at 847–48, 31 L.Ed.2d at 120. The obvious solution, frequently recommended to avoid the dangers of discriminatory enforcement, would have been a specific policy adopted pursuant to notice and comment rulemaking. *See Environmental Defense Fund, Inc. v. Ruckelshaus, supra,* 439 F.2d at 598 (courts should insist on rules and regulations that articulate the standards by which discretion is exercised) (cases cited). *See also Davis,* §§ 7.26, 9.7 (same).

The district court concluded its opinion noting "[t]he appearance and allegations of discrimination in the case at bar could have been avoided by promulgation of the new detention rule pursuant to the APA." *Louis III* at 1001–02. We agree, though we find the discrimination real. The rulemaking requirements of the APA provide a minimum, not a maximum, to administrative procedure; they serve a crucial purpose in guiding administrative discretion. That is, and should be, the lesson of this case.

## IV. Dismissed Claims: Asylum and Counsel

Prior to trial, on the basis of standing, exhaustion, and 8 U.S.C. § 1105a, the district court dismissed seven claims. Plaintiffs appeal the dismissal of two: whether individuals appearing for a preliminary inspection at the border are entitled to have counsel present and notice of that right and whether the INS must provide aliens with notice of the right to file for political asylum. *Louis II,* 532 F.Supp. 881, 885–92 (S.D.Fla.1982). Plaintiffs argue 8 U.S.C. § 1105a does not bar the claims, adequate injury was alleged to give them standing, and exhaustion was not necessary in the given case.

### A. *8 U.S.C. § 1105a*

Construing the Immigration Act of 1917 in *Heikkila v. Barber,* 345 U.S. 229, 73 S.Ct. 603, 97 L.Ed. 972 (1953), the Supreme Court held habeas corpus was the only means by which to challenge a final order of deportation. In a series of cases in the mid-1950's, however, the Court indicated the Immigration Act of 1952 mandates a different result. *Brownell v. Tom We Shung,* 352 U.S. 180, 77 S.Ct. 252, 1 L.Ed.2d 225 (1956); *Shaughnessy v. Pedreiro,* 349 U.S. 48, 75 S.Ct. 591, 99 L.Ed. 868 (1955). These cases held that in addition to habeas corpus, an action for declaratory or injunctive relief would lie to test the legality of deportation and exclusion orders.

■ Largely in response to *Brownell v. Tom We Shung, supra,* Congress amended the 1952 Act to include § 1105a, which reads in pertinent part:

(b) Notwithstanding the provisions of any other law, any alien against whom a final order of exclusion has been made heretofore or hereafter under the provisions of section 1226 of this title or comparable provisions of any prior Act *may obtain judicial review of such order by habeas corpus proceedings and not otherwise.*

(c) An order of deportation or of exclusion shall not be reviewed by any court if the alien has not exhausted the administrative remedies available to him as of right under the immigration laws and regulations or if he has departed from the United States after the issuance of the order . . . .

(emphasis supplied). Congress enacted § 1105a to cure what it perceived to be widespread abuse of judicial process by aliens against whom final orders of deportation or exclusion had been entered. *See, e.g., Brownell* (petitioner We Shung manages to delay deportation seven years while litigating issue of review). Section 1105a(b) makes clear that an alien in custody subject to exclusion has only one means of available review, an action for habeas corpus in the district court following exhaustion of all administrative remedies. Relying on § 1105a the district court dismissed the two claims raised on appeal.

■ The government virtually concedes that the express language of § 1105a does not govern the claims advanced by the Haitians. "To be sure, 8 U.S.C. § 1105a by its terms deals with judicial review of . . . 'a final order of exclusion,' whereas the plaintiffs have not yet undergone exclusion . . .

hearings." Appellees supp. cross-brief at 20. The government argues, however, that the intent of Congress in enacting § 1105a was to limit judicial review of exclusion proceedings to one proceeding—habeas corpus—rather than permit collateral attack before commencement of, or following, the immigration proceeding.[55]

Although the government's statement of Congressional intent is accurate, it is incomplete. Though Congress was concerned with unjustifiable delay, it was concerned with fair hearings as well. A close examination of the legislative material shows a balance of these competing interests.

Committee reports, and letters from administration officials included therein, evidenced displeasure with suits brought "solely for the purpose of preventing or delaying indefinitely [ ] deportation from this country," H.R.Rep. No. 1086, 87th Cong., 1st Sess., *reprinted in* 1961 U.S.Code Cong. & Ad.News 2950, 2967, and complained of the "alien who has once had his day in court, with full rights of appeal to the higher courts, . . . [and who is] permitted to block his removal and cause unnecessary expense to the government by further judicial appeals, the only purpose of which is delay," *id.* at 2968. Congress was interested in ensuring, however, that the alien receive a fair determination of his right to reenter or remain. *Id.* at 2967 (habeas will permit determination of whether hearing was fair, and exclusion on basis of grounds specified by Congress). It is an accurate statement of the legislative intent, we believe, that section 1105a provide "a fair, just, uniform and expeditious system of judicial review," *id.* at 2969 (letter of March 30, 1959 from Lawrence E. Walsh, Deputy Attorney General, to Hon. Emanuel Celler, Chairman, Committee on the Judiciary, House of Rep-

---

**55.** Because we presume judicial review of agency action unless review explicitly is precluded by statute, *Barlow v. Collins,* 397 U.S. 159, 166, 90 S.Ct. 832, 837, 25 L.Ed.2d 192, 199 (1970); *Celanese Chemical Company, Inc. v. United States,* 632 F.2d 568, 575 n. 15 (5th Cir.1980), we question the propriety of restrict-

ing judicial review in this case, where the government concedes the statute does not govern. We need not decide this question, however, in light of our decision that the intent of Congress was not to restrict review in this case.

resentatives) (approving amendment to 1952 Act on behalf of administration). Our examination of plaintiffs' claims in light of the need for a fair, just, uniform and expeditious review convinces us that by passing 1105a Congress did not intend to close the courthouse doors to the issues dismissed by the court below.

Two factors in particular lead us to this conclusion. First, we do not here review the claims of one individual seeking relief from an order of exclusion. Rather, we are presented with the claims of over one thousand incarcerated aliens challenging similar procedural irregularities occurring prior to the commencement of exclusion hearings. Requiring each of these individuals to proceed to a final order only then to challenge the procedures on habeas would be neither uniform nor expeditious. Ignoring these issues would be to frustrate, not further, the intent of Congress. Given the opportunity to resolve at this juncture issues of widespread applicability, it would be error to decline jurisdiction on the basis of § 1105a.

■ We reasoned similarly in *Haitian Refugee Center v. Smith,* 676 F.2d 1023 (5th Cir. Unit B 1982), where the issue was whether the district court correctly retained jurisdiction over claims of the Haitian Refugee Center alleging procedural violations in the government's handling of asylum claims of deportable Haitians. Upholding jurisdiction in the district court we stated:

> Although a court of appeals may have sole jurisdiction to review alleged procedural irregularities in an individual deportation hearing *to the extent these irregularities may provide a basis for reversing an individual deportation order,* that is not to say that a program, pattern or scheme by immigration officials to violate the constitutional rights of aliens is

not a separate matter subject to examination by a district court and to the entry of at least declaratory and injunctive relief. The distinction we draw is one between the authority of a court of appeals to pass upon the merits of an individual deportation order and any action in the deportation proceeding to the extent it may affect the merits determination, on the one hand, and, on the other, the authority of a district court to wield its equitable powers when a wholesale, carefully orchestrated, program of constitutional violations is alleged.

*HRC v. Smith,* 676 F.2d at 1033 (emphasis in original). The distinction enunciated in *Smith,* between an individual challenge to a deportation ruling and a wholesale program of constitutional violations, applies equally to exclusion proceedings.[56]

There is yet a significant second factor. In this case we have no confidence that the alleged violations ever will be remedied in subsequent administrative or habeas proceedings. In *Louis I* this concern also was expressed:

> In addition, the testimony has amply established that many of the refugees in the remote areas are unrepresented and are unlikely to be represented, either at their exclusion proceedings, at any possible appeal to the Board of Immigration Appeals, or to obtain judicial review of the issuance of a final order of exclusion by habeas corpus. Without such representation, a refugee receiving a final order, will thus be subject to immediate exclusion and deportation from this country.

530 F.Supp. at 928. Nor was such concern without firm foundation: eleven Haitians had already been deported pursuant to "faulty" procedures. *Id.* Not only was lack of representation a problem, but evidence taken at the preliminary injunction

---

**56.** Although the procedure due any individual alien in exclusion is not of constitutional magnitude, the character of the action changes when it challenges a widespread program calculated to deprive an entire class of statutory rights. Though the alien's due process right may only be to that process Congress determined was due, the class-wide deprivation of that process by the Executive is an equal protection violation.

hearings indicated that Creole translators often erred in translations, *id.* at 927, failed to give proper notice of the right to apply for asylum, *id.,* or to appeal the decision of the immigration judge. *Louis I,* 530 F.Supp. at 927. If an alien does not understand the right to appeal, and declines to do so, habeas review never will occur.

■ We are persuaded by the legislative history of § 1105a that Congress, as eager as it was to eliminate delay and multiplicitous proceedings, genuinely intended that aliens receive a full and fair hearing. Although in exclusion the alien is entitled only to that process Congress provides as due, *Mezei; Knauff,* here Congress intended the ancient writ to be available, and used, to resolve procedural issues. Uncertain that the will of Congress can govern in the face of procedural confusion we provide the most sensible alternative available—review of allegations of wide-spread procedural violations before those violations cause irreparable harm.[57]

Agreeing to review similar claims in deportation hearings we cautioned in *HRC v. Smith* that:

> [w]e wish to emphasize the factual uniqueness of this case. . . . Congress resolved this problem by consolidating jurisdiction over challenges to final orders of deportation in one court, the court of appeals. We do not intend by our holding today to emasculate that solution, and given the narrowness of our holding, we do not expect such a result.

*Id.* at 1033. Our decision should not be viewed as a departure from the admonition

in *HRC v. Smith.* Rather, it is yet another decision under facts paralleling, and related to, those in *HRC v. Smith.*

### B. *Standing and Exhaustion*

■ In addition to § 1105a the district court relied on principles of standing and exhaustion to dismiss Counts II and VII. Standing is a mandatory jurisdictional consideration: Article III requires a plaintiff prove injury before federal courts may hear his cause. *Sierra Club v. Morton,* 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972); *Baker v. Carr,* 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962). Exhaustion on the other hand is discretionary in the district court: although as a general matter judicial economy and deference to administrative tribunals require a plaintiff to pursue all administrative remedies prior to requesting relief in court, circumstances may mitigate against exhaustion in a given case. *National Labor Relations Board v. Industrial Union of Marine and Shipbuilding Workers,* 391 U.S. 418, 419, 426 n. 8, 88 S.Ct. 1717, 1723, n. 8, 20 L.Ed.2d 706 (1968); *HRC v. Smith, supra* at 1034; *Patsy v. Florida International University,* 634 F.2d 900, 904 (5th Cir.1981), *rev'd on other grounds,* 457 U.S. 496, 102 S.Ct. 2557, 73 L.Ed.2d 172 (1982).

■ Exhaustion requires that plaintiffs pursue all available administrative remedies prior to asking a court for relief. *McKart v. United States, supra,* 395 U.S. 185, 193–95, 89 S.Ct. 1657, 1662–63, 23 L.Ed.2d 194 (1969). Exhaustion advances a number of valuable goals, including:

**57.** § 1105a is inapplicable altogether if the asserted claim is unrelated to exclusion hearings. *See Foti v. INS,* 375 U.S. 217, 229, 84 S.Ct. 306, 314, 11 L.Ed.2d 281, 290–92 (1963) (1105a encompasses all claims within final review of administrative process); *Cheng Fan Kwok v. INS,* 392 U.S. 206, 215–17, 88 S.Ct. 1970, 1975–77, 20 L.Ed.2d 1037, 1044–45 (1968) (same). In *HRC v. Smith* we interpreted Supreme Court precedent to mean that § 1105a(a) [exclusive review in Court of Appeals] applied to "any attack *upon the proceedings* in which a deportation order was entered or upon any matter 'intimately and immediately associated' with the final order or *'governed by the regulations applicable to the deportation proceeding itself,*

and . . . ordinarily presented to the special inquiry officer who entered the deportation order' . . . ." *Id.* at 1032 (citation omitted). We believe similar analysis would apply to review of exclusion hearings as governed by § 1105a(b). Under this analysis plaintiffs' claim concerning notice of the asylum right may be eligible for separate review to the extent that a claim could be brought more favorably first before the district director, as some testimony indicates. Because we rely instead on a broader rationale, however, we need not determine those issues, if any, cognizable in an independent action brought by an individual.

(1) allowing the agency to develop a more complete factual record; (2) permitting the exercise of agency discretion and expertise on issues requiring this; (3) preventing deliberate disregard and circumvention of established agency procedures; and (4) enhancing judicial efficiency and eliminating the need for judicial vindication of legal rights by giving the agency the first opportunity to correct any error.

*HRC v. Smith, supra* at 1034 (citations omitted). When, however, these policies are not served by requiring exhaustion, the district court may, in an exercise of its sound discretion, excuse the exhaustion requirement. *Industrial Union of Marine & Shipbuilding Workers, supra,* 391 U.S. 418, 419, 426 n. 8, 88 S.Ct. 1717, 1723 n. 8, 20 L.Ed.2d 706 (1968).

The district court found plaintiffs failed to exhaust administrative remedies for the counsel and asylum claims, asserting the ills of the alleged violations could be cured at any point prior to entry of a final order of exclusion. *Louis II,* 532 F.Supp. at 888 & nn. 8–9. Addressing the counsel claim the court stated: *"[i]f an alien has a right* to be represented by counsel during an interview with an INS representative, and *if* a statement is taken from him in derogation of that right, which is used in subsequent proceedings and results in the entry of a final order of exclusion, that practice or procedure is reviewable on appeal to the BIA and in habeas proceedings." *Id.* Because class members most probably will be represented by counsel in subsequent exclusion hearings, *see, e.g.,* Stipulation Regarding Intervention of the Dade County Bar Association Haitian Refugee Volunteer Lawyer Task Force, and because the violation does "merge" into the final order of exclusion, we do not believe the district court abused its discretion in dismissing the counsel claim as unexhausted. Accordingly, we need not reach the question of standing on the counsel claim.

Standing and exhaustion as they apply to the asylum claim present a very different question. We disagree that the harm alleged in the asylum claim may be cured in subsequent proceedings. An alien uninformed of the right to request asylum is denied any opportunity to present an asylum claim before the district director. Testimony in the record indicates that requesting asylum before the district director is more favorable than asserting an asylum claim before an immigration judge in exclusion proceedings. Whether or not the chance of success is greater in the former proceeding, it is non-adversarial, which is not the case before the immigration judge, where an asylum claim is opposed by the INS. *See* 41 Tr. 824 (Anker testimony). Proceeding before the district director is undeniably one extra avenue to pursue in an attempt to remain in this country.

Consequently, the right to request asylum from the district director does not merge into a final order of exclusion. The proceeding before the district director is ancillary to, not a part of, the administrative proceedings reviewable before the BIA and on habeas. In *HRC v. Smith* we rejected a similar argument. *Id.* at 1035–36. There plaintiffs challenged the procedures used by the district director in addressing asylum claims, and we held exhaustion before the immigration judge unnecessary because administrative proceedings were an entirely different matter: the immigration judge simply has no authority over the district director. *A fortiori,* failing to notify plaintiffs here of their right to claim asylum deprived them altogether of an opportunity to appear before the district director. As we explained in *HRC v. Smith:*

> It is tautological that the exhaustion doctrine does not preclude the exercise of jurisdiction when there are no further administrative remedies to pursue.

*Id.* at 1035. *See also Porter v. Schweiker,* 692 F.2d 740 (11th Cir.1982).

Our determination on grounds of exhaustion applies also to the question of standing. The district court held plaintiffs lacked injury-in-fact because the injury

only was "threatened," and could be cured in the exclusion proceeding. *Louis II, supra,* at 890–91. In part this is based on the district court's adherence to the notion that the process to which plaintiffs are entitled, *Mezei, Knauff,* is nothing more than an exclusion hearing. This is error. The Administration's own witnesses characterized the proceeding for asylum before the district director as a statutory and regulatory right. Statement of Alan C. Nelson before the House Committee on the Judiciary, Subcommittee on Immigration, Refugees, and International Law (Oct. 28, 1981) at 5 (law permits two avenues of asylum; district director and immigration judge); *Meissner testimony* at 3–4 (same). As we noted, *supra,* denial of this course of action cannot be cured in exclusion proceedings. The immigration judge has no authority over, or to remand to, the district director. *HRC v. Smith,* 676 F.2d at 1035. Accordingly, if they are entitled to notice plaintiffs suffer injury when they are not informed of the availability of district director review. Whether they are so entitled we next address on the merits.

## C. *The Merits*[58]

■ We previously have held that there is "at a minimum, a constitutionally protected right to petition our government for political asylum." *HRC v. Smith,* 676 F.2d at 1038. Because the basis for that right applies equally to excludable and de-

portable aliens, *id.,*[59] the right to petition for asylum applies to the cross-appellants before us. In *HRC v. Smith* the process by which asylum claims were evaluated was found faulty. *A fortiori,* failure to notify an alien of the right to claim asylum, thereby closing the door entirely on the process, must violate the right to present a petition for asylum.

The record shows that Haitians arrive in this country unschooled in our language and largely in ignorance of our legal system. *Cf. Louis I, supra,* at 926 (need for Creole translators). The record also indicates that "even in Miami, where INS Creole translators are presumably proficient, the translations at these [exclusion] proceedings are woefully inadequate." *Id.* at 927. Given this state of affairs we can hardly expect the Haitians arriving at our shores to be aware of, and prepared to exercise, their right to claim asylum.

■ Congress, however, passed the Refugee Act of 1980, which confers the right to apply for political asylum, to give "statutory meaning to our national commitment to human rights and humanitarian concerns not reflected in the Immigration and Naturalization Act of 1952, as amended." S.Rep. No. 96–256, 96th Cong., 2nd Sess. 1, *reprinted in* 1980 U.S.Code Cong. & Ad.News 141. That commitment is meaningless without notification of the right. *Orantes-Hernandez v. Smith,* 541 F.Supp. 351 at 361 (C.D. Cal.1982); *cf. HRC v. Smith.* Accordingly,

---

**58.** The government, apparently convinced we would uphold the court below on the issue of jurisdiction, deemed it unnecessary to brief the merits of plaintiffs' claim. Although an adversary presentation serves to enhance our decisionmaking process, established precedent in this area convinces us that plaintiffs' claim has merit.

The government also urges we abstain from deciding this issue because it was not decided by the court below. *See Equal Employment Opportunity Commission v. Standard Forge and Axle Company, Inc.,* 496 F.2d 1392 (5th Cir.), *cert. denied,* 419 U.S. 1106, 95 S.Ct. 776, 42 L.Ed.2d 801 (1974). *Standard Forge* is premised upon cases such as *Hormel v. Helvering,* 312 U.S. 552, 61 S.Ct. 719, 85 L.Ed. 1037 (1941); those cases make clear the reason for

abstention is to allow the lower court or administrative body to hear evidence. *Id.* at 556–57, 61 S.Ct. at 721, 85 L.Ed. at 1041. As the government stipulated to presenting this question as a pure question of law, however, letter from Thomas E. Moseley to Ira J. Kurzban (1/8/82), and as we agree, there is no bar to our proceeding on the merits.

**59.** The opinion of this court in *HRC v. Smith* relies upon regulations in 8 C.F.R. to support its determination of a constitutionally protected right to apply for asylum. Those same sections apply equally to excludable and deportable aliens. *Compare* 8 C.F.R. 108.1 (1978) *with* 8 C.F.R. 208.1; 208.2 (1982).

we hold for plaintiffs on the merits of this claim.

## V. Access

Evidence at trial identified significant restrictions on Haitian access to legal counsel, restrictions on Haitian contact with relatives and friends in the Miami community, and efforts to prevent HRC attorneys from approaching Haitians to inform them of their legal rights. See Px 70; 72a–c (letters requesting access; generally denied); *Louis III* at 983, n. 27; Px 15 (Guidelines of Non-Media Visitors). Plaintiffs' complaint challenged these restrictions on numerous grounds, all but the first amendment claim were dismissed prior to trial. Plaintiffs do not challenge the dismissals. After trial the district court found the access claim moot because of the order to release the detained Haitians; the merits of the claim, therefore, never was addressed. Plaintiffs challenge the mootness holding and request a determination on the merits.

The issues raised in this ground of appeal are moot only if no class members are, or could in the future be, in detention or if the challenged INS conduct has ceased. Even under the order of the court below releasing the Haitians, however, INS retains discretion to revoke parole in appropriate cases. *See Louis v. Nelson,* 544 F.Supp. 1004, Final Judgment, n. 6. We proceed, therefore, to the merits.

The government urges us to abstain from deciding the access question on the merits because the issue was not decided by the court below and requires development of a factual record. *See Thomas v. J.C. Penney Co., Inc.,* 531 F.2d 270 (5th Cir.1976). HRC denies an insufficient record and argues that regardless of the record the INS access guidelines are facially invalid under the strict requirements of the first amendment. Plaintiffs, therefore, would have us award injunctive relief. *See e.g., Quaker Action Group v. Hickel,* 421 F.2d 1111, 1116 (D.C. Cir.1969).

■ We agree with the government as to the impropriety of immediate relief. Although we find merit in the plaintiffs' association claims, this case does not involve an absolute denial of access, nor does it involve rules we can hold facially impermissible without knowledge of the countervailing circumstances. The government argues, and we agree, that regulation of aliens in detention is analogous to regulation in the prison context.[60] Accordingly, a determination of proper access regulations requires balancing the government's interest in detention and security against the plaintiffs' first amendment rights; preliminarily, a more developed factual record is essential.[61]

In the interest of judicial economy, however, we find merit in plaintiff's first amendment claims under the rationales of *NAACP v. State ex rel. Patterson,* 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958); *NAACP v. Button,* 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963); and *In re Primus,* 436 U.S. 412, 98 S.Ct. 1893, 56 L.Ed.2d 417 (1978). In *Cruz v. Beto,* 603 F.2d 1178 (5th Cir.1979), we established that certain rights of mutual access exist between prisoners and counsel.

■ More particularly we sustain plaintiff HRC's purely legal claim of a right to solicit clients in detention. Although this solicitation may not permit individual face-to-face encounter, if *Button* and *Primus*

---

**60.** The analogy serves its purpose insofar as concerns for security weigh in the balancing process. We limit our holding to this narrow point; there are obvious differences between temporary detention of innocent aliens and the incarceration of convicted felons.

**61.** The Guidelines of Non-Media Visitors, Px 15, appear overly restrictive. We nonetheless remand for a determination of whether these are the rules in force, how they are enforced, and how they compare with other access regulations for detention facilities. We reiterate that on the basis of the record before us we have insufficient information regarding the validity of these access restrictions.

mean anything they permit legal counsel to inform individuals of their legal rights when counsel does so as an exercise of political speech unaccompanied by expectation of remuneration. Ample evidence supports HRC's role as a politically active representative of the Haitian community. *See Louis III* at 984 n. 28. Evidence also shows that absent HRC's assistance many of the refugee class members would never have been informed of important statutory rights accorded them by Congress. Consequently we uphold the efforts of HRC in this regard.

 We emphasize, however, that first amendment rights in the prison context, sacrosanct as first amendment rights are, remain subject to reasonable restrictions necessitated by the requirements of security and management of the prison community. No cases cited by plaintiffs hold otherwise. Accordingly, we remand this issue for review of the government's access restrictions in light of the principles enunciated herein.

## VI. Attorneys' Fees

While this case was before us plaintiffs presented a motion for attorneys' fees. We remand this issue as well, for decision in light of this opinion.

## VII. Conclusion

In summation, we reiterate the Executive branch has full authority to protect and control our national borders. In the area of immigration Congress has empowered the Executive to adopt policies necessary to this objective. Therefore, though the change from the old policy to the new policy represented a distinct change in enforcement, from a policy of ready parole with limited exceptions to one of detention with limited exceptions, that policy determination was properly within the realm of Executive decisionmaking. Because those responsible for defining the scope of the policy failed to do so, leaving those who implemented it to apply a "binding norm" of widespread detention of Haitians, recourse to notice and comment rulemaking was required. Accordingly, we affirm the district court as to Count II of plaintiffs' complaint.

 We find clearly erroneous, however, based on our careful and searching review of the record, the district court's conclusion that in the enforcement of the new policy there was no discrimination against plaintiff class. On the contrary, there was ample unrebutted evidence that plaintiffs were denied equal protection of the laws, as mandated both by the Constitution and our interpretation of Congress' enabling immigration legislation.[62] Although we hold that the Executive, through the INS, has the power when properly delegated to fashion such policies as are necessary to protect our borders and ensure orderly entrance of aliens, those policies must be administered in a non-discriminatory manner. Such a requirement is consistent with the basic principles upon which this country was founded. We therefore reverse the judgment of the district court as to Count VII.

Although we reverse the district court on the equal protection claim, the ultimate result remains the same: plaintiffs impermissibly have been denied parole. We remand to the court below for such relief as is necessary to remedy the discrimination and effectuate the rationale of this decision. Such relief shall include, but is not limited to: (1) an injunction against discriminatory enforcement of the new policy, (2) the continued parole of class members, (3) record-keeping requirements so the district court may ensure the policy is effectuated in the future in a non-discriminatory manner, (4) such relief as is necessary to resolve the asylum and access issues, and (5) whatever further relief is necessary to ensure that all aliens, regardless of their nationality or ori-

---

**62.** *See supra* at 1485 (Congress may draw distinctions between classes of aliens; Executive may not do so absent authorization from Congress).

gin, are accorded equal treatment.[63]

AFFIRMED in part, REVERSED in part, and REMANDED.

63. The relief of the district court ordering the release of class members was premised on an APA violation. We require the release to remedy discriminatory enforcement of the new policy. The terms of the relief ordered by the district court are not inconsistent with our holding here today and the court below should feel free to adhere to its original release program, supplementing it as necessary to ensure there is no repetition of the equal protection violation.